Elizabeth W. Lund
BERG LILLY, PC
1 West Main Street
Bozeman, MT 59715
T: 406-587-3181
F: 406-587-3240
lund@berglawfirm.com

William D. Coglianese (*pro hac vice*)
Shirlethia V. Franklin (*pro hac vice*)
Theresa C. Martin (*pro hac vice*)
JONES DAY
51 Louisiana Avenue NW
Washington, DC 20001
T: 202-879-3939
F: 202-646-1700
wcoglianese@jonesday.com
sfranklin@jonesday.com
tcoughlin@jonesday.com

## IN THE UNITED STATES DISTRICT COURT
## FOR DISTRICT OF MONTANA
## HELENA DIVISION

| | |
|---|---|
| THE STATE OF MONTANA, *ex rel.*, AUSTIN KNUDSEN, ATTORNEY GENERAL, <br><br>         *Plaintiff*, <br><br> v. <br><br> ELI LILLY AND COMPANY, *et al.*, <br><br>         *Defendants*. | Case No. 6:22-cv-00087-BMM <br><br> **ELI LILLY AND COMPANY, NOVO NORDISK INC., AND SANOFI-AVENTIS U.S. LLC'S BRIEF IN SUPPORT OF RULE 12(b)(6) MOTION TO DISMISS** |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................1

BACKGROUND ................................................................................3

    A.    The Distribution of, and Payment for, Branded Prescription Drugs ................................................................................3

    B.    The Rebate System Is Well Known To The State ...............................6

    C.    This Lawsuit ................................................................................9

ARGUMENT ................................................................................11

I.    The State's Claims Are All Untimely. ...........................................11

    A.    Each Claim Accrued Well Before September 2019............................11

    B.    The State Cannot Save Its Complaint Through Any Exception To The Statutes Of Limitations............................................13

        1.    The State cannot establish that discovery-rule tolling applies. ................................................................................14

        2.    The State cannot establish fraudulent concealment or estoppel. ................................................................................19

        3.    The State cannot invoke the continuing-violation doctrine................................................................................20

II.    The State's Claims All Fail on The Merits....................................21

    A.    The State Fails To Adequately Allege A Violation Of The MUTPCPA. ................................................................................21

        1.    The State fails to plausibly allege that the Manufacturers committed any deceptive act....................................22

        2.    The State fails to allege that the Manufacturers committed any unfair trade practice. .......................................28

    B.    The State Fails To Adequately Allege Unjust Enrichment.................31

    C.    The State Fails To Adequately Allege Civil Conspiracy....................34

CONCLUSION ................................................................................35

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Agar Corp. v. Electro Circuits Int'l, LLC*,
580 S.W.3d 136 (Tex. 2019) ...............................................................12

*Anderson v. BNSF Ry.*,
354 P.3d 1248 (Mont. 2015)................................................................13

*Arthur v. Pierre Ltd.*,
100 P.3d 987 (Mont. 2004)..................................................................19

*Associated Mgmt. Servs. v. Ruff*,
424 P.3d 571 (Mont. 2018)..............................................................32, 33

*Billings Post No. 1634 v. Mont. Dep't of Revenue*,
943 P.2d 517 (Mont. 1997)..................................................................31

*Bybee v. Bank of Am. Corp.*,
2015 WL 12747955 (D. Mont. Aug. 7, 2015)..................................20

*Chor v. Piper, Jaffray & Hopwood*,
862 P.2d 26 (Mont. 1993)..............................................................25, 26

*Christian v. Atl. Richfield Co.*,
358 P.3d 131 (Mont. 2015)..................................................................20

*City of Miami v. Eli Lilly & Co.*,
No. 21-cv-22636 (S.D. Fla. June 16, 2021)..........................................9

*Deming v. Ciox Health, LLC*,
2022 WL 605691 (9th Cir. Mar. 1, 2022) ...........................................29

*Disability Rights Mont., Inc. v. Batista*,
930 F.3d 1090 (9th Cir. 2019) ..............................................................3

*Draggin' Y Cattle Co. v. Addink*,
312 P.3d 451 (Mont. 2013)..................................................................14

*Dreiling v. Am. Exp. Co.*,
458 F.3d 942 (9th Cir. 2006) ...............................................................18

*Duffy v. Butte Teachers' Union*,
541 P.2d 1199 (Mont. 1975) ..............................................................34

*Eike v. Allergan, Inc.*,
850 F.3d 315 (7th Cir. 2017) ..............................................................31

*Estate of Watkins v. Hedman, Hileman & Lacosta*,
91 P.3d 1264 (Mont. 2004) ................................................................26

*Friends of the Flathead River v. U.S. Forest Serv.*,
2022 WL 2751772 (D. Mont. July 14, 2022) ....................................17

*FTC v. Cyberspace.com, LLC*,
453 F.3d 1196 (9th Cir. 2006) .......................................................22, 23

*FTC v. Sperry & Hutchinson Co.*,
405 U.S. 233 (1972) ............................................................................29

*GCN Prods. v. O'Young*,
22 F. App'x 772 (9th Cir. 2001) .........................................................26

*Gomez v. State*,
975 P.2d 1258 (Mont. 1999) ...............................................................21

*Guzman v. Polaris Indus., Inc.*,
49 F.4th 1308 (9th Cir. 2022) .............................................................31

*Harris Cnty. v. Eli Lilly & Co.*,
2022 WL 479943 (S.D. Tex. Feb. 16, 2022) .....................................32

*Harris Cnty. v. Eli Lilly & Co.*,
No. 19-cv-04993 (S.D. Tex. Nov. 21, 2019) ........................................9

*In re GlenFed, Inc. Sec. Litig.*,
42 F.3d 1541 (9th Cir. 1994) ..............................................................27

*In re Graphics Processing Units Antitrust Litig.*,
527 F.Supp.2d 1011 (N.D. Cal. 2007)................................................35

*In re Insulin Pricing Litig.*,
No. 17-699 (D.N.J. Feb. 2, 2017), ECF 1 .......................................9, 16

*In re ZF-TRW Airbag Control Units Prods. Liab. Litig.*,
601 F.Supp.3d 625 (C.D. Cal. 2022) ..................................................13

*Johnson v. Trumpet Behav. Health, LLC*,
　　2022 WL 74163 (N.D. Cal. Jan. 7, 2022).............................................31

*Kananen v. South*,
　　307 P.3d 309 (Mont. 2013)...............................................................19

*Kearns v. Ford Motor Co.*,
　　567 F.3d 1120 (9th Cir. 2009) .....................................................26, 28

*Kentucky v. Novo Nordisk, Inc.*,
　　No. 19-CI-473 (Ky. Cir. Ct. May 13, 2019) ........................................9

*Konecky v. Allstate Fire & Casualty Ins. Co.*,
　　2017 WL 6625038 (D. Mont. Dec. 28, 2017) ....................................34

*Let the People Vote v. Bd. of Cnty. Comm'rs*,
　　120 P.3d 385 (Mont. 2005)...............................................................20

*Meridian Project Sys. v. Hardin Constr. Co.*,
　　404 F.Supp.2d 1214 (E.D. Cal. 2005) ..............................................27

*Minnesota v. Sanofi-Aventis U.S. LLC*,
　　No. 3:18-cv-14999 (D.N.J. Oct. 16, 2018), ECF No. 2........................9

*Mississippi v. Eli Lilly & Co.*,
　　No. 3:21-cv-674 (S.D. Miss. Oct. 21, 2021), ECF No. 1-5............9, 13

*Mont. Digital, LLC v. Trinity Lutheran Church*,
　　473 P.3d 1009 (Mont. 2020)..............................................................33

*Morning Star Packing Co. v. S.K. Foods, L.P.*,
　　2015 WL 3797774 (E.D. Cal. June 18, 2015) ....................................15

*Olson v. Bank of Am. Corp.*,
　　2015 WL 13829106 (D. Mont. May 28, 2015) ...................................20

*Osterman v. Sears, Roebuck & Co.*,
　　80 P.3d 435 (Mont. 2003).........................................................14, 19

*Pharm. Care Mgmt. Ass'n v. District of Columbia*,
　　522 F.3d 443 (D.C. Cir. 2008).............................................................7

*PNC Bank, Nat'l Ass'n v. Wilson*,
　　2015 WL 3887602 (D. Mont. June 23, 2015) ....................................26

*Schumacker v. Meridian Oil Co.*,
    956 P.2d 1370 (Mont. 1998) .......................................................34, 35

*Semegen v. Weidner*,
    780 F.2d 727 (9th Cir. 1985) .............................................................28

*Sharma v. Volkswagen AG*,
    524 F.Supp.3d 891 (N.D. Cal. 2021) .................................................31

*Signal Peak Energy, LLC v. E. Mont. Minerals, Inc.*,
    922 F.Supp.2d 1142 (D. Mont. 2013) ..........................................34, 35

*Snyder v. Love*,
    153 P.3d 571 (Mont. 2006) ...............................................................13

*Sonner v. Premier Nutrition Corp.*,
    971 F.3d 834 (9th Cir. 2020) ......................................................31, 32

*Stafford v. Brink's, Inc.*,
    2015 WL 12699458 (C.D. Cal. Dec. 1, 2015) ....................................9

*Sullivan v. Cherewick*,
    391 P.3d 62 (Mont. 2017) .................................................................12

*Swartz v. KPMG LLP*,
    476 F.3d 756 (9th Cir. 2007) ............................................................27

*Textana, Inc. v. Klabzuba Oil & Gas*,
    222 P.3d 580 (Mont. 2009) .........................................................19, 20

*Welu v. Twin Hearts Smiling Horses, Inc.*,
    386 P.3d 937 (Mont. 2016) .........................................................32, 33

*Wilson v. Hewlett-Packard Co.*,
    668 F.3d 1136 (9th Cir. 2012) ..........................................................31

*Wisconsin v. Abbott Labs.*,
    390 F.Supp.2d 815 (W.D. Wis. 2005) .............................................7, 8

*Wolfe v. Flathead Elec. Coop., Inc.*,
    431 P.3d 327 (Mont. 2018) ...............................................................21

*Young v. Era Advantage Realty*,
    513 P.3d 505 (Mont. 2022) .........................................................*passim*

**S**TATUTES

42 U.S.C. § 1395w-3a ..................................................................4, 6, 24

42 U.S.C. § 1396r–8(a)(1) ....................................................................6

Mont. Code Ann. § 27-2-102(1)(a)....................................................12, 13

Mont. Code Ann. § 27-2-102(3) ............................................................14

Mont. Code Ann. § 27-2-103 .................................................................12

Mont. Code Ann. § 27-2-202(3) ............................................................12

Mont. Code Ann. § 27-2-211(1)(c)........................................................12

Mont. Code Ann. § 30-14-103 ...............................................................22

Mont. Code Ann. § 30-14-133 ...............................................................22

Montana Pharmacy Benefit Manager Oversight Act ("PBMOA").
   67th Leg., SB 395 (2021), *codified at* Mont. Code Ann. § 33-2-
   2401, *et seq.* ......................................................8, 24, 25, 29
   Mont. Code Ann. § 33-2-2402(7) .................................................8, 24
   Mont. Code Ann. § 33-2-2402(11) ....................................................24
   Mont. Code Ann. § 33-2-2402(13) ......................................................8
   Mont. Code Ann. § 33-2-2402(14) ....................................4, 8, 24, 25
   Mont. Code Ann. § 33-2-2406(1) .................................................6, 9, 24
   Mont. Code Ann. § 33-2-2407(1) ......................................................24

**O**THER **A**UTHORITIES

Matthew Herper, *Inside the Secret World of Drug Company Rebates*
   FORBES (May 10, 2012) .................................................................17

Mont. R. Civ. P. 8 ...............................................................................28

Mont. R. Civ. P. 9 .............................................................22, 26, 27, 28

Mont. R. Civ. P. 12 .............................................................................26

NASHP, *Montana Explores a New Approach to Regulating Pharmacy
   Benefit Managers* (Feb. 26, 2019) .....................................................8

Andrew Pollack, *Health Insurers Pressing Down on Drug Prices*,
   N.Y. TIMES (June 20, 2014) ..............................................................17

Andrew Schneider, *Insulin price spike leaves diabetes patients in crisis*, BILLINGS GAZETTE (Aug. 21, 2016).........................................................17

Katie Thomas, *Drug Prices Keep Rising Despite Intense Criticism*, N.Y. TIMES (Apr. 26, 2016).................................................................................17

**INTRODUCTION**

Montana (or "the State") challenges conduct that is lawful under both federal and Montana law, and that in any event has been known to the State since long before the applicable limitations periods expired. The State's claims center on the rebates that drug manufacturers Eli Lilly and Company, Novo Nordisk Inc., and Sanofi-Aventis U.S. LLC (collectively, the "Manufacturers") pay to intermediaries known as Pharmacy Benefit Managers (the "PBMs"). The State acknowledges that the Manufacturers pay those rebates to secure placement of their insulin medications on the formularies that the PBMs maintain for insurers, which determine whether millions of patients will have access to those medications. The State also recognizes that rebating is a standard industry practice that is not unique to insulin. Nevertheless, the State claims that those rebates render the Manufacturers' insulin list prices fraudulent, on the theory that those list prices should reflect the Manufacturers' net prices *after* accounting for rebates.

Even if there were anything to this theory (there is not), the State knew all the underlying facts *years* before the governing limitations periods (the longest of which is three years) ran. Indeed, the State's First Amended Complaint essentially copies and pastes from a series of complaints that have been filed against the same three Manufacturers over the past *six years*, dating back to early 2017. Yet the State provides no reason why it could not have brought these carbon-copy claims years ago,

instead of waiting more than a half-decade to do so. In fact, both the U.S. Congress and the Montana legislature have been addressing pharmaceutical rebates for years, and the Manufacturers have publicly acknowledged their payment of rebates for even longer (at least the past decade). The State's claims thus expired long ago.

Those claims also suffer from fatal substantive defects. The State's claim under the Montana Unfair Trade Practices and Consumer Protection Act ("MUTPCPA") rests on the notion that list prices are fraudulent if they do not reflect rebates. But federal law and Montana law *require* the Manufacturers to report list prices that do *not* reflect rebates. Indeed, the Montana legislature just last year enacted a statute that not only recognizes the legitimacy of paying rebates to secure formulary access, but expressly confirms that list prices shall *not* incorporate rebates. The State cannot claim that the Manufacturers acted deceptively by following federal and state law. There is also a crucial missing ingredient in the State's fraud theory: It does not and cannot identify a single instance in which any Manufacturer represented that, contrary to federal and state law, its list prices *do* reflect rebates. The State's conclusory claim of unfair trade practices also fails, as the State never explains how the Manufacturers' *accurate* reporting of list prices could violate public policy or otherwise be improper.

The State's unjust-enrichment and civil-conspiracy claims must also be dismissed, for independent reasons. The unjust-enrichment claim fails because the State

has an adequate remedy at law, because there is no basis for implying a contract between the Manufacturers and consumers or the State, and because the State cannot claim that the Manufacturers unjustly gained anything by paying PBMs rebates while their own net prices remained flat. And the civil-conspiracy claim fails both because it is derivative of the other deficient claims and because the State does not plausibly allege that the Manufacturers entered into any agreement to break the law.

The Court should dismiss all claims against the Manufacturers with prejudice.

## BACKGROUND[1]

### A.     The Distribution of, and Payment for, Branded Prescription Drugs

The Manufacturers are pharmaceutical companies that research, develop, manufacture, and sell prescription drugs, including insulin. First Am. Compl. ¶¶ 5, 237-43 ("Compl.," ECF 40). Through their research and development efforts, the Manufacturers have made insulin "safer and more convenient to use." *Id.* ¶ 247.

The Manufacturers do not sell insulin directly to patients, insurers, or health plans. Rather, their medications reach patients "in one of two ways: (1) from manufacturer to wholesaler, wholesaler to pharmacy, and pharmacy to patient; or (2) from manufacturer to mail-order pharmacy, and mail-order pharmacy to patient." *Id.* ¶ 284 & Fig. 12. The different purchasers in the distribution chain pay "different prices set by different entities for the same drugs." *Id.* ¶ 285.

---

[1] The State's allegations are assumed to be true for purposes of this motion to dismiss. *Disability Rights Mont., Inc. v. Batista*, 930 F.3d 1090, 1097 (9th Cir. 2019).

The only price that the Manufacturers set is the Wholesale Acquisition Cost ("WAC"), which is the price paid by wholesalers. *Id.* ¶ 286. By legislative design, that price does *not* include any rebates tied to the relevant drug. Federal law defines WAC as "the manufacturer's list price for the drug or biological to wholesalers or direct purchasers in the United States, *not including* prompt pay or *other discounts, rebates, or reductions in price*." 42 U.S.C. § 1395w-3a(c)(6)(B) (emphasis added). Montana law expressly incorporates that federal definition. Mont. Code Ann. § 33-2-2402(14).

Although the State asserts that "[t]here is no transparency in th[e] pricing system" for branded prescription drugs, it admits that the Manufacturers report their WACs to "publishing compendiums such as First DataBank, Redbook, and others who then publish that price." Compl. ¶¶ 286-87. Because the Manufacturers disclose the WACs of their diabetes medications, the State has long known the specific WAC of every such medication the Manufacturers sell, including the insulins at issue here—as the Complaint's charts confirm. *Id.* Figs. 2-10. The State does not allege that these prices reflect anything other than the true WAC as defined by federal and Montana law—again, the "list price … to wholesalers or direct purchasers," *before* accounting for "discounts, rebates or reductions in price." 42 U.S.C. § 1395w-3a(c)(6)(B); Mont. Code Ann. § 33-2-2402(14).

While the Manufacturers set only the WAC for their diabetes medications, the

prices charged by downstream actors differ. Compl. ¶¶ 284-85 & Fig. 12. After wholesalers purchase medications at WAC, they resell them to pharmacies at a separately negotiated price. *Id.* Pharmacies then sell medications to consumers at still different prices. *Id.* The price a patient pays a pharmacy for a medication may be partially or fully reimbursed by the patient's health plan, and varies based on each plan's benefit design. *Id.*

PBMs generally are uninvolved in the physical distribution of pharmaceutical drugs, but do play a pivotal role in the drug-pricing system. Most relevant here, PBMs work with health plans to manage pharmacy benefits—including the coverage of prescription drugs—for plan members. *Id.* ¶ 296. To that end, PBMs "establish standard formulary offerings (i.e., approved drug lists)" that determine whether a particular drug is "covered by health insurance" for that plan's members. *Id.* ¶ 7. PBMs thus have significant leverage over drug manufacturers: "unless they include a drug on one of their standard formulary offerings, it is not available to 80% of Montana's citizens." *Id.* ¶ 9.

The Complaint makes clear that the Manufacturers have reason to compete fiercely for formulary access. Placement on a formulary means that a Manufacturer's medication receives insurance coverage, making it cheaper and more accessible to consumers. *Id.* ¶¶ 7-11, 341, 362-63, 365. By contrast, a drug's exclusion from a formulary (or its unfavorable placement) can restrict patients' access to that drug,

thwarting a Manufacturer's ability to get affordable drugs to those patients. *Id.* Because the Manufacturers "must obtain preferable formulary position" if they "want their drugs to be prescribed and paid for," they each offer PBMs rebates as a means of competing for favorable formulary placement. *Id.* ¶¶ 10, 348. Federal law also expressly contemplates—and indeed sometimes requires—rebates. *E.g.*, 42 U.S.C. § 1395w-3a(c)(6)(B); 42 U.S.C. § 1396r–8(a)(1) (*requiring* manufacturers to "enter[] into … rebate agreement[s] … on behalf of States" in certain circumstances). Montana law similarly anticipates such rebates. Mont. Code Ann. § 33-2-2406(1)(c).

## B. The Rebate System Is Well Known To The State

As the Complaint illustrates, the drug-pricing practices at issue here are common and well-known. Montana, which operates health plans for government employees, contracts with PBMs to purchase prescription drugs. Compl. ¶¶ 415-20. The Complaint explains that "the State relies on PBMs" to "control[] pharmaceutical drugs costs," including by "develop[ing] and offer[ing] formularies for the State's prescription plans." *Id.* ¶¶ 416, 418. Montana thus is directly involved in the system through which the Manufacturers pay PBMs rebates for formulary placement.

The State also acknowledges that the Manufacturers and PBMs have long been openly disclosing this practice. For example, at a congressional hearing nearly four years ago, representatives from each Manufacturer discussed the "significant demand for rebates" from PBMs. *Id.* ¶ 362. They explained that higher rebates lead

to higher prices because "[s]eventy-five percent of [the] list price is paid for rebates and discounts to secure formulary position." *Id.* ¶ 363 (cleaned up). And they testified that refusing to provide rebates would have severe consequences, as PBMs would stop including the Manufacturers' medications on their formularies. *Id.* ¶¶ 362-65. The Manufacturers' public disclosures going back even further have similarly discussed these practices (*infra* Argument § I.B.1), and courts regularly note them. *See, e.g.*, *Pharm. Care Mgmt. Ass'n v. District of Columbia*, 522 F.3d 443, 445 (D.C. Cir. 2008) ("One important role of a pharmacy benefit manager is to pool health benefit providers and negotiate discounts on pharmaceuticals from manufacturers or pharmacies."); *Wisconsin v. Abbott Labs.*, 390 F.Supp.2d 815, 818 (W.D. Wis. 2005) (noting allegations that PBMs "obtain benefits for themselves in the form of fees and rebates paid by manufacturers").

Indeed, the Montana legislature itself has recognized that PBMs have substantial leverage to extract rebates, and that these rebates naturally result in a difference between a drug's WAC and the net price a manufacturer actually realizes on sales of that drug. In April 2019—well over three years before the State sued—the legislature passed a bill concerning the rebate system. 66th Leg., SB 71, § 6 (2019). That bill provided that "[a]ll compensation remitted by or on behalf of a manufacturer … that is directly or indirectly related to a health benefit plan must be remitted to and retained by the health benefit plan and used to lower health benefit plan premiums

for covered persons." *Id.* "Compensation" included "rebates, discounts, or credits." *Id.* § 1. The bill thus would have required all rebates and discounts to be given to insured consumers in the form of lower premiums. *See* NASHP, *Montana Explores a New Approach to Regulating Pharmacy Benefit Managers* (Feb. 26, 2019) (Ex. 1), https://tinyurl.com/2p85d4nj (touting the bill as "a uniquely Montana approach").

Although the governor vetoed that bill, the Montana legislature two years later passed—and the governor signed—a similar law, the Montana Pharmacy Benefit Manager Oversight Act ("PBMOA"). 67th Leg., SB 395 (2021) (codified at Mont. Code Ann. § 33-2-2401, *et seq.*)*.* The PBMOA recognizes that PBMs "negotiat[e] rebates, discounts, or other financial incentives and arrangements with manufacturers." Mont. Code Ann. § 33-2-2402(7)(a). The law does *not* prohibit or limit rebates or otherwise bar manufacturers from making the necessary payments to secure their drugs' favorable placement on formularies. On the contrary, the law specifically recognizes such rebates, and accounts for that reality by defining "rebates" and by incorporating the federal WAC definition that excludes rebates from reported prices. *Id.* § 33-2-2402(13)(a), (14). Given this acknowledgement of rebates as an established aspect of pharmaceutical sales, the PBMOA merely imposes disclosure and oversight requirements on PBMs, including by requiring them to report (on request) both the aggregate WAC and "the aggregate amount of rebates received … by therapeutic category of prescription drugs," as well as "any other fees received from a

manufacturer … and the reason for the fees." *Id.* § 33-2-2406(1)(c), (d).

## C. This Lawsuit

The Montana Attorney General—suing on behalf of the State and Montanans with diabetes—ignores Montana's recognition of the propriety of the Manufacturers' WAC prices and PBM rebates, and claims that the legislatively sanctioned system of reporting pharmaceutical prices is actually a fraudulent scheme. To that end, the Attorney General filed a Complaint that substantially copies from prior complaints against the same Manufacturers and PBMs, dating back to early 2017.[2] *See, e.g.*, Compl., *In re Insulin Pricing Litig.*, No. 17-699 (D.N.J. Feb. 2, 2017), ECF 1; Compl., *Minnesota v. Sanofi-Aventis U.S. LLC*, No. 3:18-cv-14999 (D.N.J. Oct. 16, 2018), ECF No. 2; Compl., *Kentucky v. Novo Nordisk, Inc.*, No. 19-CI-473 (Ky. Cir. Ct. May 13, 2019); Compl., *Harris Cnty. v. Eli Lilly & Co.*, No. 19-cv-04993 (S.D. Tex. Nov. 21, 2019), ECF 1-1; Compl., *City of Miami v. Eli Lilly & Co.*, No. 21-cv-22636 (S.D. Fla. June 16, 2021), ECF 1-2; Compl., *Mississippi v. Eli Lilly & Co.*, No. 3:21-cv-674 (S.D. Miss. Oct. 21, 2021), ECF No. 1-5; Compl., *Arkansas v. Eli Lilly & Co.*, No. 4:22-cv-549 (E.D. Ark. June 10, 2022), ECF No. 2. Several of those cases have since been dismissed with prejudice. Order, *Harris Cnty.*, No. 19-cv-04993, ECF No. 187; Order, *City of Miami*, No. 21-cv-22636, ECF No. 126.

---

[2] *See Stafford v. Brink's, Inc.*, 2015 WL 12699458, at *3 (C.D. Cal. Dec. 1, 2015) ("Judicial notice is proper of complaints, court orders, judgments, and other documents filed in other litigation.").

As in those other cases, the State alleges that the Manufacturers and the PBMs engaged in a purported "Insulin Pricing Scheme" that increased the prices the State and its citizens paid for diabetes medications through a system of supposedly secret rebates. Compl. ¶¶ 20-22, 338-39, 344-48, 467-83. But despite using the nefarious label "scheme," all that the State really alleges is that the PBMs have used their "dominant market share" to require the Manufacturers to pay "larger and larger" rebates for formulary access, and that the Manufacturers "raise[d] list prices" as a result. *E.g., id.* ¶ 363 (describing Eli Lilly). The State contends that the "price" of diabetes medications is higher than it should be (*id.*), and that the PBMs and Manufacturers in turn make more money. *Id.* ¶¶ 23-24, 376-413.

Notwithstanding that the payment of PBM rebates is ubiquitous and well-known—including to the State—the State now insists that those rebates are somehow fraudulent. In its telling, because the Manufacturers' WAC prices for the at-issue insulin products do not reflect rebates, they are "so untethered from the net prices … as to constitute a false price." *Id.* ¶ 21. Yet the State does not allege that any Manufacturer made *any* misrepresentation about the relationship between its WAC prices for the at-issue drugs and its profit on sales of those drugs. Nor could it: The State recognizes that each Manufacturer has openly disclosed that its net prices are less than the prices it charges wholesalers, given the need to pay rebates. *Id.* ¶¶ 362-64. The State similarly does not reconcile its theory of fraud—that list

prices must reflect rebates—with the fact that federal and Montana law *prohibit* WAC from including rebates or other discounts. Nevertheless, the State alleges that the Manufacturers acted with the "intent that diabetics and payors … rely" on the supposedly inflated WACs "in purchasing the at-issue drugs." *Id.* ¶ 513.

The State asserts three causes of action, claiming that the Manufacturers violated the MUTPCPA, were unjustly enriched, and engaged in a civil conspiracy. *Id.* ¶¶ 510-37.

## ARGUMENT

### I.    The State's Claims Are All Untimely.

The Complaint makes clear on its face that the State's claims are time-barred. Those claims all rely on the idea that the State and its consumers were harmed because the Manufacturers' list prices did not reflect rebates and were thus supposedly "inflated." *E.g.*, Compl. ¶¶ 19-29. But the State indisputably knew well before the relevant limitations periods had elapsed that list prices exclude rebates. And the State's conclusory invocations of various tolling doctrines are all unavailing as a matter of law.

#### A.    Each Claim Accrued Well Before September 2019.

All three claims accrued well before September 2019, and thus fall outside the relevant limitations periods. Under Montana law, each claim is subject to a two- or three-year limitations period:

- The MUTPCPA claim is a statutory cause of action that must be brought within two years. Mont. Code Ann. § 27-2-211(1)(c).

- The unjust-enrichment claim is a non-contractual, equitable cause of action with a three-year limitations period. *Id.* § 27-2-202(3).

- A civil-conspiracy claim takes on the limitations period of the underlying wrongful act, which is here either two or three years. *See Sullivan v. Cherewick*, 391 P.3d 62, 68 (Mont. 2017) ("It is the unlawful act— and not the conspiracy itself—that gives rise to a civil conspiracy cause of action."); *Agar Corp. v. Electro Circuits Int'l, LLC*, 580 S.W.3d 136, 142 (Tex. 2019) (collecting cases "understanding … civil conspiracy as a theory of derivative liability that shares a limitations period with that of its underlying tort").

These limitations periods apply to claims brought by the State. Mont. Code Ann. § 27-2-103. Montana law also mandates that "a claim or cause of action accrues when all elements of the claim or cause exist or have occurred, the right to maintain an action on the claim or cause is complete, and a court or other agency is authorized to accept jurisdiction of the action." *Id*. § 27-2-102(1)(a). "Lack of knowledge of the claim or cause of action, or of its accrual, by the party to whom it has accrued does *not* postpone the beginning of the period of limitation." *Id*. § 27-2-102(2) (emphasis added).

The MUTPCPA claim is thus untimely unless it accrued after September 29, 2020 (two years before the State sued); the unjust-enrichment claim is untimely unless it accrued after September 29, 2019 (three years before the State sued); and the civil-conspiracy claim is tied to those other two claims.

All three of the State's claims accrued long before those cut-off dates. Each

claim centers on pricing conduct that, as the State itself acknowledges, was occurring long before September 2019. Indeed, the State frames its Complaint as targeting conduct occurring "[o]ver the course of the last fifteen years." Compl. ¶ 13; *see also id.* ¶ 276 (challenging prices dating back to 2009). Even if there were any basis for the State's claims against the Manufacturers (there is not), the State's own allegations make clear that "all the elements of the claim or cause exist[ed] or … occurred" long before the applicable limitations periods. Mont. Code Ann. § 27-2-102(1)(a).

**B.  The State Cannot Save Its Complaint Through Any Exception To The Statutes Of Limitations.**

The State tries salvaging its untimely claims by invoking a laundry list of tolling doctrines—again, copying virtually wholesale from earlier complaints. *Compare* Compl. ¶¶ 497-509, *with* Compl. ¶¶ 438-49, *Mississippi v. Eli Lilly & Co.*, *and* Compl. ¶¶ 508-19, *Arkansas v. Eli Lilly & Co.* The State cannot so easily circumvent the limitations periods. Statutes of limitations are "designed to protect defendants" while also "foster[ing] … certainty about a plaintiff's opportunity for recovery and a defendant's potential liabilities." *Anderson v. BNSF Ry.*, 354 P.3d 1248, 1262 (Mont. 2015) (citation omitted). As such, these statutes "encourage prompt resolution of disputes by providing a simple procedural mechanism to dispose of stale claims." *Snyder v. Love*, 153 P.3d 571, 573 (Mont. 2006) (citation omitted). The State's threadbare tolling recitations provide no basis for overriding those objectives. *See In re ZF-TRW Airbag Control Units Prods. Liab. Litig.*, 601 F.Supp.3d 625, 827

(C.D. Cal. 2022) (applying Montana law and holding that "conclusory allegation[s]" did not establish basis for tolling).

### 1. The State cannot establish that discovery-rule tolling applies.

The State first invokes discovery-rule tolling, to no avail. Compl. ¶¶ 499-504. That "rule only applies when the facts constituting the claim are concealed, self-concealing, or when the defendant has acted to prevent the injured party from discovering the injury or cause." *Draggin' Y Cattle Co. v. Addink*, 312 P.3d 451, 456 (Mont. 2013); *see also* Mont. Code Ann. § 27-2-102(3). The State makes no such allegations. Rather, it concedes that the Manufacturers *publicly disclosed* the relevant facts—their payment of steep rebates to the PBMs for formulary access, and the approximate amounts of those rebates—well before the limitations period. *E.g.*, Compl. ¶ 363. The discovery rule thus does not apply here.

Even if the rule *were* available, the State must—but does not—show that it exercised ordinary diligence in pursuing its claims. *See Osterman v. Sears, Roebuck & Co.*, 80 P.3d 435, 441 (Mont. 2003) ("For purposes of tolling the statute of limitations in an action for fraud or unfair trade practices, ordinary diligence must be exercised by the aggrieved party in the discovery of the facts constituting the fraud or deceptive practice."). The question "is whether the plaintiff has information of circumstances sufficient to put a reasonable person on inquiry, or has the opportunity to obtain knowledge from sources open to his or her investigation." *Id.* (citation

omitted). The State cannot make this showing, because it actually knew the facts underlying its claims for years before it sued.

**First**, both the U.S. Congress and Montana's own legislature have been publicly considering the at-issue pricing practices for years—dating back to more than three years before the State sued.[3] In fact, the State devotes an entire section of its Complaint to an April 2019 congressional hearing on pharmaceutical rebate practices. Compl. ¶¶ 356-75. As the State notes, that public (and widely publicized) hearing specifically focused on insulin prices, and representatives of all three Manufacturers there acknowledged the role of PBM rebates in driving insulin prices. *See id.* ¶ 362 (Novo Nordisk's president: "[I]f we eliminate all the rebates … we would be in jeopardy of losing [our formulary] positions."); *id.* ¶ 363 (Lilly's Senior V.P.: "We have to provide rebates [to PBMs] in order to provide and compete for [formulary position]."); *id.* ¶ 364 (Sanofi's Executive V.P. for External Affairs: "The rebates are how the system has evolved.").

Nor was Congress the only legislative body to debate these pricing practices. As explained above, the Montana legislature passed a bill regulating the PBMs' use of rebates and manufacturer payments (SB 71) in the same month as the congressional hearing (April 2019). *Supra* at 7-9. The State cannot claim concealment of

---

[3] *See Morning Star Packing Co. v. S.K. Foods, L.P.*, 2015 WL 3797774, at *2 (E.D. Cal. June 18, 2015) (taking judicial notice of "official records of the legislative branch").

issues that *its own legislature* was openly considering and addressing.

**Second**, the State's ability to have filed this suit long before September 2019 is further confirmed by the fact that its Complaint overwhelmingly tracks other complaints filed against the *same* Manufacturers, alleging the *same* theory of wrongdoing. As noted above, the earliest of these lawsuits was filed six years ago, in February 2017. Compl., *In re Insulin Pricing Litig.*, No. 17-699 (D.N.J. Feb. 2, 2017), ECF No. 1 ("*Insulin Pricing*"). Like the State's Complaint, the *Insulin Pricing* complaint centered on a so-called "scheme" in which the same Manufacturers supposedly "inflat[ed] the benchmark prices of rapid- and long-acting analog insulin drugs" to facilitate their payment of rebates "in exchange for formulary status." *Id.* ¶¶ 14, 21; *see also id.* ¶¶ 2, 10-12 (alleging that drug manufacturers conspire with PBMs to inflate the spread between list and net prices as part of a "*quid pro quo*" for formulary placement). Indeed, many of the State's allegations are copied near-verbatim from the *Insulin Pricing* complaint. *Compare e.g.*, *id.* ¶ 123 (alleging that "[i]n 13 instances since 2009," Sanofi and Novo Nordisk raised prices for their insulins "in tandem, 'taking the same price increase down to the decimal point within a few days of each other'"), *with* Compl. ¶ 276 (alleging that "[i]n 13 instances since 2009," Sanofi and Novo Nordisk raised prices of their insulins "in tandem, taking the same price within a few days of each other").

The State's Complaint similarly imitates complaints filed by other states and

municipalities over the past half-decade—including several before September 2019. *Supra* at 9 (citing complaints filed by Minnesota and Kentucky). Each of those complaints relied on the *exact same* supposed scheme that the State alleges here. *See, e.g.*, Compl. ¶ 3, *Minnesota*, ECF No. 2 (alleging that the Manufacturers "publish and disseminate deceptive and misleading list prices for their products, which allow them to offer higher rebates to PBMs"); Compl. ¶ 9, *Kentucky* (alleging that the Manufacturers "inflate their list prices in order to be able to offer greater rebates to PBMs"). These nearly identical complaints show that the facts underlying this case have been well-known—and relied upon for lawsuits against the Manufacturers— long before the State filed this copycat action.

**Third**, news outlets and the Manufacturers themselves have for years been publicly discussing rebates' impact on the prices of insulin and other drugs. As early as 2012, widely followed publications—in Montana and across the country—were reporting on these dynamics.[4] The Manufacturers disclosed the same facts. For example, Sanofi in 2014 acknowledged that it "had to increase the level of rebates for

---

[4] *See* Andrew Schneider, *Insulin price spike leaves diabetes patients in crisis*, BILLINGS GAZETTE (Aug. 21, 2016) (Ex. 2); Katie Thomas, *Drug Prices Keep Rising Despite Intense Criticism*, N.Y. TIMES (Apr. 26, 2016) (Ex. 3); Andrew Pollack, *Health Insurers Pressing Down on Drug Prices*, N.Y. TIMES (June 20, 2014) (Ex. 4); Matthew Herper, *Inside the Secret World of Drug Company Rebates*, FORBES (May 10, 2012) (Ex. 5). The Court can take judicial notice of publications "as an indication of what information was in the public realm at the time." *Friends of the Flathead River v. U.S. Forest Serv.*, 2022 WL 2751772, at *6 n.2 (D. Mont. July 14, 2022).

Lantus® required to maintain favorable formulary positions with key payers in the U.S." Sanofi, 2014 Annual Report (Form 20-F) at 11 (Mar. 10, 2015) (Ex. 6), https://tinyurl.com/m4udvmbb; *see also id.* at 105 ("To maintain [favorable formulary] positions, we had to significantly increase the level of discounts offered in order to match the substantial rebates offered by our competitors.").[5] Novo Nordisk in 2013 disclosed that it paid over 32 billion Danish Krone (i.e., over $5 billion at then-current exchange rates) in rebates and other discounts to obtain "formulary status." Novo Nordisk, 2013 Annual Report (Form 6-K) at 64 (Feb. 5, 2014) (Ex. 7), https://tinyurl.com/5256uvw9. And Eli Lilly in 2010 reported that "[i]n response to competitive pressures, [it] ha[d] entered into arrangements with [purchasers] which provide for discounts or rebates." *See* Eli Lilly & Co., 2009 Annual Report (Form 10-K) at 3, 26 (Feb. 22, 2010) (Ex. 8), https://tinyurl.com/5n6v4rke (warning of "pressures for increased pharmaceutical discounts and rebates").

The Manufacturers' open acknowledgment of the practices at issue here— *eight to thirteen years ago*—belies the State's claim that the Manufacturers "created a 'hide-the-ball' system." Compl. ¶ 384. But even more to the point, it confirms that the State could have brought its claims years ago.

The State thus knew all the necessary facts to sue well before September 2019,

---

[5] *See Dreiling v. Am. Exp. Co.*, 458 F.3d 942, 946 n.2 (9th Cir. 2006) (courts "may consider documents referred to in the complaint or any matter subject to judicial notice, such as SEC filings").

and cannot now show that it exercised "ordinary diligence" by waiting *years* to file this Complaint. *Osterman*, 80 P.3d at 441. The discovery rule is inapplicable.

### 2. The State cannot establish fraudulent concealment or estoppel.

The State's failure to exercise diligence similarly disqualifies it from establishing fraudulent-concealment tolling or estoppel. Fraudulent concealment "tolls the statute of limitations until the cause of action is discovered or could have been discovered through due diligence." *Kananen v. South*, 307 P.3d 309, 312 (Mont. 2013). Similarly, "the party asserting estoppel must lack knowledge of the truth regarding the alleged misrepresented fact" and must "also lack a readily available means of knowledge as to the truth." *Arthur v. Pierre Ltd.*, 100 P.3d 987, 995-96 (Mont. 2004). But for all the reasons explained above, the State does not and cannot explain how the facts underlying its claim could have been unknown to it.

Nor has the State plausibly alleged the concealment or deception that these doctrines require. "Fraudulent concealment entails the employment of artifice, planned to prevent inquiry or escape investigation, and to mislead or hinder information acquisition." *Textana, Inc. v. Klabzuba Oil & Gas*, 222 P.3d 580, 587 (Mont. 2009).[6] And "equitable estoppel[] requires the misrepresentation of a material fact."

---

[6] The State alleges only that the Manufacturers engaged in "knowing and *active* fraudulent concealment." Compl. ¶ 505 (emphasis added). To the extent it is nonetheless suggesting that the Manufacturers could have somehow committed fraudulent concealment by silence, that "duty to disclose" theory fails for lack of a

*Let the People Vote v. Bd. of Cnty. Comm'rs*, 120 P.3d 385, 390 (Mont. 2005). But the State nowhere explains how the Manufacturers could have possibly concealed or misrepresented anything when they (1) were *publicly disclosing* the practices at issue here years before this suit, and (2) have never suggested that their list prices indicated anything other than what federal and Montana law expressly require. The State therefore fails to establish that either of these doctrines applies.

### 3. The State cannot invoke the continuing-violation doctrine.

Finally, the State's single-sentence invocation of the continuing-violation doctrine also fails. "A continuing tort is one that is 'not capable of being captured by a definition of time and place of injury because it is an active, progressive and continuing occurrence. It is taking place at all times.'" *Christian v. Atl. Richfield Co.*, 358 P.3d 131, 140 (Mont. 2015) (citation omitted). The doctrine has thus "been applied only to trespass and nuisance cases," as such conduct "can be reasonably abated." *Olson v. Bank of Am. Corp.*, 2015 WL 13829106, at *3-4 (D. Mont. May 28, 2015) (declining to apply continuing-tort doctrine to claims under the Montana Consumer Protection Act); *see also Bybee v. Bank of Am. Corp.*, 2015 WL 12747955, at *5 (D. Mont. Aug. 7, 2015) ("[T]his is not a trespass to land or nuisance

---

fiduciary or trust relationship between Montana and the Manufacturers, which the State fails to plead. *See, e.g.*, *Textana, Inc.*, 222 P.3d at 587-88 (finding "affirmative duty to disclose" sufficient to toll the statute of limitations only after determining that there was a "trust relationship").

suit such as would justify use of a continuing tort theory to avoid an applicable statute of limitations.").

This is not a trespass or nuisance case, and the continuing-violation doctrine has no application here. Indeed, the Montana Supreme Court has rejected attempts to expand the continuing-violations doctrine beyond real-property suits when, like here, the plaintiff had knowledge of the supposed violations but failed to sue. *See Gomez v. State*, 975 P.2d 1258, 1263 (Mont. 1999) ("[T]o apply a continuing tort theory to delay the beginning of the limitations period until the last injurious exposure …, thereby allowing and even encouraging injured persons to remain in harmful conditions for an indeterminate amount of time, could delay the running of the limitations period indefinitely."). If the State thought the Manufacturers' practices were unlawful, it could have and should have sued years ago. *See Wolfe v. Flathead Elec. Coop., Inc.*, 431 P.3d 327, 330 (Mont. 2018) (plaintiffs cannot restart the clock on the basis of an "ongoing" breach when they "knew or reasonably should have known of … purported breaches" much earlier).

In short, all of the State's claims are untimely and must be dismissed.

## II. The State's Claims All Fail on The Merits.

Even if the State's claims were not time-barred, they all fail.

### A. The State Fails To Adequately Allege A Violation Of The MUTPCPA.

The State first invokes the MUTPCPA, which prohibits "unfair or deceptive

acts or practices in the conduct of any trade or commerce." Mont. Code Ann. § 30-14-103. The State claims that the Manufacturers have committed deceptive and unfair acts by publishing WACs for the at-issue products that do not reflect their net prices. Compl. ¶¶ 513, 517. But the Complaint is devoid of any factual allegations substantiating its conclusory assertions of misleading or unfair conduct, nor does it allege that the Manufacturers had any duty to disclose more than they already did. And even if the State *had* made such allegations, the claim independently fails because the State does not even attempt to comply with the heightened standard for pleading fraud under Rule 9(b). The MUTPCPA claim should be dismissed.[7]

### 1. The State fails to plausibly allege that the Manufacturers committed any deceptive act.

Under the MUTPCPA, deception requires an act "(1) … likely to mislead consumers *acting reasonably* under the circumstances (2) in a way that is material." *FTC v. Cyberspace.com, LLC*, 453 F.3d 1196, 1199 (9th Cir. 2006) (emphasis added); *accord Young v. Era Advantage Realty*, 513 P.3d 505, 513 (Mont. 2022). Here, the only supposed misrepresentations attributable to the Manufacturers are the WACs for their insulin products. *E.g.*, Compl. ¶ 513. The State fails to plausibly

---

[7] Although the State seeks, among other things, "all equitable relief," "restitution," and "disgorgement" under the MUTPCPA (Compl. ¶ 523), that statute does not authorize such relief in actions brought by the Montana Department of Justice. *See* Mont. Code Ann. § 30-14-133 (providing for "any other equitable relief" considered "necessary or proper" only in actions brought by "consumer[s]").

allege any way in which those reported prices are deceptive.

**_First_**, the State does not plausibly allege that the Manufacturers' reported WAC prices would likely mislead a reasonable consumer. *Cyberspace.com*, 453 F.3d at 1199. At no point in its 537-paragraph Complaint does the State identify *anything* supposedly fraudulent about those WAC prices. To the contrary, it acknowledges that the Manufacturers reported exactly what they said they were reporting: their diabetes medications' list prices. Compl. ¶¶ 286-88, 426. And the Complaint asserts that those list prices are "directly tied to" the actual prices wholesalers pay for the drugs. *Id.* ¶¶ 285-88. The State cannot claim that the Manufacturers misled reasonable consumers by reporting WAC prices *accurately*.[8]

The State thus tries a different tack. It hypothesizes that, simply by "report[ing] and publish[ing] list prices," the Manufacturers fraudulently represented that those "reported prices were reasonably related to the net prices for the at-issue drugs"—that is, that their WAC prices accounted for the rebates that reduce the

---

[8] In fact, the State does not allege that consumers ever even *see* the Manufacturers' WAC prices. It acknowledges that the Manufacturers "self-report WAC … to publishing compendiums" and "also published these prices to the PBMs and their pharmacies." Compl. ¶¶ 287, 426-27. But it never claims that the Manufacturers ever published their WACs *to consumers*, or that the compendiums that compile WACs (which are specialized industry resources) are available to—let alone seen by—consumers. Consumers cannot be at risk of deception from representations that they "did not read" and "did not know about." *Young*, 513 P.3d at 514 (affirming dismissal of MUTPCPA claim where plaintiff "had no knowledge" of the "allegedly deceptive statement" when making the relevant purchase).

Manufacturers' "net prices." Compl. ¶ 513; *see also, e.g.*, ¶¶ 421-22, 424. But the State does not claim that any Manufacturer ever *said* that its WAC prices accounted for rebates or "were reasonably related to [its] net prices." *Id.* ¶ 513. Nor *could* any Manufacturer have made that representation, given that federal and Montana law expressly require a "manufacturer's list price" to "*not* includ[e] prompt pay or other discounts, rebates or reductions in price." 42 U.S.C. § 1395w-3a(c)(6)(B) (emphasis added); Mont. Code Ann. § 33-2-2402(14).

No reasonable consumer would have thought that WACs include rebates when the Manufacturers repeatedly said they do not, and when federal and state law expressly provide that they cannot. Indeed, a reasonable consumer would have been misled if the Manufacturers *did* publish WACs that reflect rebates, in contravention of the law. This alone defeats the State's deception theory.

**Second**, the recently enacted PBMOA confirms the lack of deception by expressly recognizing that pharmaceutical manufacturers pay rebates to PBMs that are not reflected in their reported WACs. The PBMOA defines PBMs as entities "that provide[]" particular "services," including "negotiating rebates, discounts, or other financial incentives and arrangements with manufacturers." *Id.* § 33-2-2402(7)(a), (11)(a). Far from prohibiting such rebates, the PBMOA recognizes that PBMs will receive rebates and establishes circumstances in which the PBMs must disclose information regarding those rebates. *See id.* §§ 33-2-2406(1), 33-2-2407(1). In certain

instances, PBMs must report the "wholesale acquisition costs"—i.e., WACs—of categories of drugs that they purchase, which (again) is defined the same way as it is in federal law: as *excluding* rebates. *Id.* § 33-2-2402(14).

The State's theory of fraud is therefore directly at odds with the PBMOA. The "list prices" that the State claims are "false"—because they are supposedly "untethered from the net prices realized by the Manufacturers" (Compl. ¶ 21)—in fact completely track the PBMOA's definition of WACs, which recognizes that the Manufacturers' list prices do *not* indicate any relationship to their net prices after rebates. The State does not—because it cannot—even attempt to explain how conduct that falls directly in line with Montana law could nonetheless be deceptive.

***Third***, the State at times attempts to frame its MUTPCPA claim as one grounded in fraudulent omission, claiming that the Manufacturers "conceal[ed] the fact that their published prices were untethered from the actual, net prices they were paid for the at-issue drugs." *Id.* ¶ 513. Even setting aside that the Manufacturers repeatedly disclosed their payment of rebates to PBMs—and reported prices exactly as federal law and Montana law require (*e.g.*, *id.* ¶¶ 362-65)—the State has failed to allege facts capable of supporting a fraudulent-omission claim.

"[F]or an omission … to constitute fraud, the plaintiff must first demonstrate that the defendant had a duty to disclose the fact at issue." *Chor v. Piper, Jaffray & Hopwood*, 862 P.2d 26, 31 (Mont. 1993). That duty to disclose arises from a "trust

or confidential relationship … between the parties." *Estate of Watkins v. Hedman, Hileman & Lacosta*, 91 P.3d 1264, 1270 (Mont. 2004). By contrast, "[p]arties engaged in an arm's length business transaction do not have a duty to disclose absent a fiduciary or other similar relationship of trust and confidence." *GCN Prods. v. O'Young*, 22 F. App'x 772, 774 (9th Cir. 2001); *accord Chor*, 862 P.2d at 32.

Here, the State nowhere alleges that the Manufacturers owe consumers a duty to disclose. Indeed, there is *no* business transaction—not even an "arm's length" business transaction—between the Manufacturers and consumers. *O'Young*, 22 F. App'x at 774. As the Complaint states, the Manufacturers deal only with wholesalers or mail-order pharmacies—*not* consumers (Compl. ¶ 284)—and the State concedes there is no contractual relationship between the Manufacturers and consumers (*id.* ¶ 532). Because the State fails to allege a duty to disclose on the part of the Manufacturers, it cannot proceed on a fraudulent-omission theory.

**Finally**, the fatal deficiencies of the State's deception claim become even clearer when held up to the requirements of Rule 9(b), which apply to allegations of deceptive and unfair conduct supposedly arising from a "unified course of fraudulent conduct." *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124, 1125, 1127 (9th Cir. 2009); *see also PNC Bank, Nat'l Ass'n v. Wilson*, 2015 WL 3887602, at *7 (D. Mont. June 23, 2015) (applying Rule 9(b) to MUTPCPA claim). That Rule "requires more specificity" than Rule 12, "including an account of the 'time, place, and specific

content of the false representations as well as the identities of the parties to the misrepresentations.'" *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007) (citation omitted). A plaintiff also "must set forth what is false or misleading about a statement, and why it is false." *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1548 (9th Cir. 1994), *superseded by statute on other grounds*. "[T]he plaintiff cannot do anything less and still comply with Rule 9(b)'s mandate to set forth with particularity those circumstances which *constitute* the fraud." *Id.* The State, moreover, "must satisfy [the] Rule 9(b) particularity requirements for *each* defendant"; group pleading does not suffice. *Meridian Project Sys. v. Hardin Constr. Co.*, 404 F.Supp.2d 1214, 1226 (E.D. Cal. 2005) (emphasis added).

Even if the State had at least plausibly alleged fraud (it has not), it comes nowhere near satisfying Rule 9(b)'s heightened requirements. It fails to allege the time, place, or content of a single supposedly false representation. Instead, it relies on entirely generic allegations, claiming that "Defendants"—as a group, without any individualized allegations—"reported and published artificially inflated prices for each at-issue drug." Compl. ¶ 513. List prices change regularly, but the State gives no indication of *which* prices, at what dates, and in what publications, are, in its view, "artificially inflated." It thus falls far short of the particularity that Rule 9(b) requires.

Nor does the State ever "set forth what is false or misleading about" the Manufacturers' WAC prices. *GlenFed*, 42 F.3d at 1548. Again, the State does not identify

a single instance in which any Manufacturer claimed that its WAC prices represent anything other than what federal and state law require—prices charged to wholesalers, *not* including rebates or discounts. And it never even tries to explain how it could be fraudulent for the Manufacturers to report WAC prices that reflect precisely what they are required to reflect. No matter how many times the State labels Defendants' WAC prices "fraudulent" and "artificial," those labels cannot make up for the State's failure to articulate what the Manufacturers said that is supposedly false. *See, e.g.*, *Semegen v. Weidner*, 780 F.2d 727, 731 (9th Cir. 1985) (insufficient to "set forth conclusory allegations of fraud, … punctuated by a handful of neutral facts").

### 2. The State fails to allege that the Manufacturers committed any unfair trade practice.

The State also fails to state a claim for an unfair trade practice. This claim is also subject to Rule 9(b), as it arises from the same alleged "unified course of fraudulent conduct" as the State's deception claim. *Kearns*, 567 F.3d at 1127; *see also* Compl. ¶ 517 (predicating unfairness claim on "Defendants' egregiously inflated prices"). But the claim cannot satisfy even the more liberal Rule 8 standard. The State must allege a practice that is "contrary to established public policy *and* which is either immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." *Young*, 513 P.3d at 513 (quoting *Anderson v. ReconTrust Co., N.A.*, 407 P.3d 692, 700 (Mont. 2017)). It satisfies neither of those requirements.

*First*, the State fails to allege any practice "contrary to established public policy." *Young*, 513 P.3d at 513 (citation omitted). Such public policy must be "established by statutes, the common law, or otherwise"; put differently, it must be "within at least the penumbra of some common-law, statutory, or other established concept of unfairness." *FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 244 n.5 (1972) (citation omitted). But the State does not point to anything that can pass for "established public policy" against the Manufacturers' reporting WAC prices that exclude rebates. *Young*, 513 P.3d at 513. Just the opposite: Given that federal and Montana statutes *require* the Manufacturers to omit rebates and other payments from their WACs, the Manufacturers *followed* "established public policy."

Nor can the State claim that the payment of rebates is itself contrary to "established" policy. The State's own legislature has twice enacted bills on the topic of rebates—and in neither instance did it attempt to prohibit manufacturers from paying rebates, much less declare them deceptive or unlawful. *Supra* at 7-9. The 2019 bill that was passed but vetoed would have merely regulated the *recipients' use* of rebates—not the Manufacturers' payment of rebates. And the enacted PBMOA requires only certain disclosures *about* rebates. There is no way to square this on-point legislative activity with the notion that paying rebates violates an "established public policy." *See, e.g.*, *Deming v. Ciox Health, LLC*, 2022 WL 605691, at *2 (9th Cir. Mar. 1, 2022) ("Given that the Montana Legislature specifically declined to apply

the statutory 'reasonable fee' limitations to Plaintiffs' circumstances, Plaintiffs have failed to establish any plausible basis for concluding that requiring HIPAA-regulated health care providers to charge 'reasonable fees' for medical records is an 'established public policy' in Montana or that Defendants acted unfairly.").

***Second***, the State independently fails to adequately allege that the Manufacturers engaged in actions that were "immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." *Young*, 513 P.3d at 513 (citation omitted). The State tries to transform the Manufacturers' WACs into an unfair practice by describing them as "untethered from production costs," or "egregiously inflated." Compl. ¶ 517. But the State does not claim that the Manufacturers held their WACs out as bearing any relationship to production costs—and for good reason. If (as is openly stated and widely known) the Manufacturers pay rebates for formulary access, and if (as federal law and Montana law require) those rebates are not included in the WAC price, the WAC price necessarily will depart from the cost of producing insulin. The State never explains why *anyone* would expect the WAC price to equal production costs, nor why the fact that it does not would be "unfair."

Ultimately, the State's allegations of an "unfair" practice boil down to its conclusory insistence that the WACs are "egregiously inflated" and have "substantial," "severe[]," and "detrimental[]" impacts. *Id.* That is not enough. "The fact that a seller does not sell the product that you want, or at the price you'd like to pay, is not an

actionable injury." *Eike v. Allergan, Inc.*, 850 F.3d 315, 318 (7th Cir. 2017). Without

more, the State's conclusory allegations fail. *See Wilson v. Hewlett-Packard Co.*,

668 F.3d 1136, 1144 n.4 (9th Cir. 2012) ("The court is not required to accept as true

allegations that are merely conclusory …." (cleaned up; citation omitted)).

## B. The State Fails To Adequately Allege Unjust Enrichment.

The State's unjust-enrichment claim also fails for independent reasons.

***First***, the claim fails because the State cannot seek an equitable remedy with-

out pleading "that [it] lacks an adequate remedy at law." *Sonner v. Premier Nutrition*

*Corp.*, 971 F.3d 834, 844 (9th Cir. 2020). "[T]o entertain a request for equitable

relief, a district court must have equitable jurisdiction, which can only exist under

federal common law if the plaintiff has no adequate remedy." *Guzman v. Polaris*

*Indus., Inc.*, 49 F.4th 1308, 1313 (9th Cir. 2022); *see also Billings Post No. 1634 v.*

*Mont. Dep't of Revenue*, 943 P.2d 517, 522 (Mont. 1997) (similar, under Montana

law). Thus, to bring an unjust-enrichment claim, the State must "alleg[e] that [it]

actually lack[s] adequate remedies at law." *Johnson v. Trumpet Behav. Health, LLC*,

2022 WL 74163, at *3 (N.D. Cal. Jan. 7, 2022). But the State makes no such allega-

tion—to the contrary, it alleges both that it has a remedy under the MUTPCPA and

that it has a contract with Defendant CVS Caremark. A "prayer for equitable relief

states a claim" only if the pleading "demonstrate[s] the inadequacy of a legal rem-

edy." *Sharma v. Volkswagen AG*, 524 F.Supp.3d 891, 907 (N.D. Cal. 2021). Here,

the State has not even tried to do so, and in fact has done the opposite.[9]

**Second**, the claim fails because the Court cannot imply a contract here. "Unjust enrichment is an obligation created by law in the absence of an agreement between the parties." *Welu v. Twin Hearts Smiling Horses, Inc.*, 386 P.3d 937, 945 (Mont. 2016). Courts thus apply the doctrine "when a contract in law is implied by the facts and circumstances of the case, but no actual contract exists between the parties." *Id.* By contrast, there is no unjust-enrichment claim when the relationships at issue are governed by a contract. *See Associated Mgmt. Servs. v. Ruff*, 424 P.3d 571, 595 (Mont. 2018) ("[A] valid contract defines the obligations of the parties as to matters within its scope, displacing to that extent any inquiry into unjust enrichment." (quoting Restatement (Third) of Restitution § 2(2))).

These principles doom the State's unjust-enrichment claim. Again, the State alleges that a contract between it and one or more PBMs *does* exist, noting that it contracted with Defendant CVS Caremark for "PBM and pharmacy services" "[d]uring the relevant time period." Compl. ¶ 417; *id.* ¶¶ 121-24, 418-19. As another federal court recently explained in dismissing similar allegations against the Manufacturers, the State cannot use unjust enrichment to revisit contractual terms and "object[] to [an allegedly] artificially inflated price that [it] paid." *Harris Cnty. v. Eli*

---

[9] These same principles would defeat any claim for restitution under the MUTPCPA (even if such relief were available under that statute). *Sonner*, 971 F.3d at 844; *supra* n.7.

*Lilly & Co.*, 2022 WL 479943, at *14 (S.D. Tex. Feb. 16, 2022).

Even setting aside the State's CVS Caremark contract, there is no basis for implying a contract between Montana (or its consumers) and the Manufacturers. This is not a situation where the "facts and circumstances of the case" mean there *should* have been a contract but the parties neglected to write one. *Welu*, 386 P.3d at 945. There is no contract because, again, the Manufacturers have no direct relationship—and thus no privity—with the consumers or the State. It makes no sense to imply a contract when there is no set of facts where one would exist.

***Third***, unjust enrichment requires a defendant to have "unjustly *gained* something of value." *Ruff*, 424 P.3d at 595 (emphasis added). But beyond a conclusory allegation that the Manufacturers "knowingly accepted the unjust benefits of their unfair and deceptive conduct" (Compl. ¶ 529), the State never tries alleging *how* the Manufacturers have unjustly gained anything of value. Indeed, the State acknowledges that the Manufacturers have no gains to relinquish, as it recognizes that they have "largely maintain[ed] their net prices" even as it claims that the Manufacturers' payment of rebates resulted in "artificially inflated" list prices. *Id.* ¶ 344. So under the State's own theory, the Manufacturers have not "retain[ed]" any allegedly unjust "benefit," and there is thus no unjust gain to remedy. *Mont. Digital, LLC v. Trinity Lutheran Church*, 473 P.3d 1009, 1012 (Mont. 2020).

## C. The State Fails To Adequately Allege Civil Conspiracy.

The State's last count, alleging "a civil conspiracy … to violate the MUT-PCPA and to commit unjust enrichment" (Compl. ¶ 535), also fails.

To start, this claim is wholly derivative of the MUTPCPA and unjust-enrichment claims, and thus fails with them. "[I]t is not the conspiracy itself that gives rise to the cause of action; it is the torts committed or the wrong done in furtherance of a civil conspiracy that do so." *Schumacker v. Meridian Oil Co.*, 956 P.2d 1370, 1373 (Mont. 1998). "[W]hen parties merely do what they have a legal right to do, and when the means used are not unlawful—an allegation in a complaint that the action amounts to a 'Conspiracy' gives no right of action to anyone, even if the parties agreed among themselves to take such action." *Duffy v. Butte Teachers' Union*, 541 P.2d 1199, 1203 (Mont. 1975). For all the reasons explained above, the State cannot show that the Manufacturers' publication of their WACs is unlawful. Without an underlying wrong, the civil-conspiracy claim is an empty shell. *Konecky v. Allstate Fire & Casualty Ins. Co.*, 2017 WL 6625038, at *5 (D. Mont. Dec. 28, 2017); *Signal Peak Energy, LLC v. E. Mont. Minerals, Inc.*, 922 F.Supp.2d 1142, 1153 (D. Mont. 2013) (dismissing civil-conspiracy claim that "repeats the same speculative allegations that have already been found to fail to support plausible tort claims").

Even if the State had alleged an underlying wrong, its repeated—and wholly conclusory—references to "coordinated efforts" are not enough to adequately allege

a conspiracy. *E.g.*, Compl. ¶¶ 92, 134, 186, 206, 275, 354, 412. All that the State actually alleges is that the PBMs and Manufacturers communicate with one another—communications that it baldly asserts "appear to" relate to the supposed "Scheme." *Id.* This is nowhere near enough. A complaint must permit the court to "infer more than the mere possibility" of conspiracy. *Signal Peak Energy*, 922 F.Supp.2d at 1153. Here, it is unremarkable that PBMs and Manufacturers communicate with each other—as they of course must when negotiating over formulary access—and the State offers nothing more that could suggest that those routine business relationships are in furtherance of an unlawful conspiracy. *See Schumaker*, 956 P.2d at 1374 (evidence that oil companies were customers of a trucking company was "insufficient to create an inference that they knew of, agreed to, or promoted any illegal transportation of hazardous material by" the trucking company); *In re Graphics Processing Units Antitrust Litig.*, 527 F.Supp.2d 1011, 1014, 1021, 1023-24 (N.D. Cal. 2007) (dismissing extensive allegations of "secret meetings and communications," "[a]ttendance at trade shows and conferences" that were "sponsored" by defendants, and "parallel pricing" as inadequate to "show a plausible entitlement to relief"). For this reason, too, the State's conclusory civil-conspiracy claim fails.

## CONCLUSION

For all of these reasons, the Manufacturers respectfully request that the Court dismiss the Complaint with prejudice.

DATED this 23rd day of February, 2023.

By: /s/ Elizabeth W. Lund
BERG LILLY, PC
*Attorney for Defendant Sanofi-Aventis U.S. LLC*

By: /s/ William M. Mercer
HOLLAND & HART - BILLINGS
*Attorney for Defendant Eli Lilly and Company*

By: /s/ Emma L. Mediak
GARLINGTON, LOHN & ROBINSON, PLLP
*Attorney for Defendant Novo Nordisk Inc.*

**CERTIFICATE OF COMPLIANCE**

I hereby certify that the lines in this document are double spaced, that the type in this document is proportionately spaced and is in 14-point font, and that this document consists of a total of 8,821 words, excluding the table of contents, table of citations, certificate of service, and certificate of compliance.

*/s/ Elizabeth W. Lund*
Elizabeth W. Lund