Jennifer M. Studebaker
Tanya D. Ellis (*Admitted pro hac vice*)
Forman Watkins & Krutz LLP
210 East Capitol Street, Suite 2200
Jackson, Mississippi 39201
Telephone: (601) 960-8600
Fax: (601) 960-8613
jennifer.studebaker@formanwatkins.com
tanya.ellis@formanwatkins.com

Anna Schneider
Bureau Chief, Office of Consumer Protection
Montana Department of Justice
P.O. Box 200151
Helena, Montana 59620-0151
Telephone: (406) 444-4500
anna.schneider@mt.gov

W. Lawrence Deas (*Admitted pro hac vice*)
Liston & Deas, PLLC
605 Crescent Boulevard
Ridgeland, Mississippi 39157
Telephone: (601) 981-1636
lawrence@listondeas.com

Matthew C. McDonald (*Admitted pro hac vice*)
David Nutt & Associates, PC
605 Crescent Boulevard
Ridgeland, Mississippi 39157
Telephone: (601) 898-7302
mattm@davidnutt.com

Josh Wackerly (*Admitted pro hac vice*)
The Cicala Law Firm PLLC
101 College Street
Dripping Springs, Texas 78620
Telephone: (512) 275-6550
josh@cicalapllc.com

***Attorneys for Plaintiff***

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## HELENA DIVISION

THE STATE OF MONTANA, *EX. REL.*, AUSTIN KNUDSEN, ATTORNEY GENERAL

PLAINTIFF,

V.

ELI LILLY AND COMPANY, ET AL.

*DEFENDANTS.*

Case No. 6:22-CV-00087-BMM-JTJ

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO EVERNORTH HEALTH, INC.'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION**

# TABLE OF CONTENTS

INTRODUCTION ...............................................................................................1

FACTUAL AND PROCEDURAL BACKGROUND .............................................2

ARGUMENT ....................................................................................................9

   I.   Legal Standard ...............................................................................9

   II.  The State's Factual Allegations Are Uncontested and Must Be Accepted As True................................................................................11

   III. Based On the Uncontroverted Facts, Montana's Long-Arm Reaches Evernorth For the State's Claims. ...............................................12

       A.  Evernorth is subject to Montana's long-arm because it transacted business in Montana. ......................................................12

       B.  Evernorth is subject to  Montana's long-arm because it committed acts resulting in the accrual of a tort action in Montana..................13

   IV. The Uncontroverted Facts Satisfy Federal Due Process for Personal Jurisdiction Over Evernorth. ....................................................15

       A.  Evernorth purposefully directed its activities at Montana................16

       B.  Evernorth's contacts with Montana directly relate to the State's claims against it. ..............................................................20

       C.  This Court's exercise of specific jurisdiction over Evernorth for the State's claims is imminently reasonable...........................................21

   V.  Alternatively, the State is Entitled to Jurisdictional Discovery Regarding Evernorth's Montana Contacts, Involvement in the Scheme, and Corporate Structure. ........................................................................22

CONCLUSION.................................................................................................24

# TABLE OF AUTHORITIES

## C<small>ASES</small>

*Abbey v. Chubb Corp.*,
2006 WL 8449567 (D. Mont. Apr. 10, 2006)...................................... 6, 9, 11, 21

*Burri Law PA v. Skurla*,
35 F.4th 1207 (9th Cir. 2022) ................................................... passim

*Calder v. Jones*,
465 U.S. 783 (1984)..........................................................................16

*Dole Food Co., Inc. v. Watts*,
303 F.3d 1104 (9th Cir. 2002) ...........................................................11

*Doverspike v. Murphy*,
2021 WL 3604813 (D. Mont. Aug. 10, 2021) ...................................... 11, 13, 14

*Duffy v. Kaman Aerospace Corp.*,
590 F. Supp. 3d 1317 (D. Mont. 2022)..................................................21

*First Nat'l Bank of Sioux Falls v. Estate of Carlson*,
448 F. Supp. 3d 1091 (D. Mont. 2020)..................................................23

*Ford Motor Co. v. Mont. Eighth Judicial Dist. Ct.*,
141 S. Ct. 1017 (2021).......................................................... 15, 19, 20

*Ford Motor Co. v. Montana Eighth Judicial Dist. Ct.,*
443 P.3d 407 (Mont. 2019)...............................................................10

*Harris Rutsky & Co. Ins. Servs. v. Bell & Clements Ltd.*,
328 F.3d 1122 (9th Cir. 2003) ...........................................................23

*In re Packaged Seafood Prod. Antitrust Litig.*,
338 F. Supp. 3d 1118 (S.D. Cal. 2018)..................................................16

*Int'l Shoe Co. v. Washington*,
326 U.S. 310 (1945)................................................................. 10, 15

*Milky Whey, Inc. v. Dairy Partners, LLC*,
342 P.3d 13 (Mont. 2015)................................................................12

*Schwarzenegger v. Fred Martin Motor Co.*,
    374 F.3d 797 (9th Cir. 2004) ...................................................................... passim

*Walden v. Fiore*,
    571 U.S. 277 (2014) ............................................................................................18

*Wolves of the Rockies, Inc. v. Stone*,
    2022 WL 123770 (D. Mont. Jan. 13, 2022) ....................................................9, 11

*World-Wide Volkswagen Corp. v. Woodson*,
    444 U.S. 286 (1980) ..................................................................................... 15, 20

## STATUTES

MONT. CODE ANN. § 30-14-103 ...............................................................................5

MONT. CODE ANN. § 30-14-111(3) ..........................................................................2

## RULES

MONT. R. CIV. P. 4(b)(1) ................................................................................. 10, 12

The State of Montana (the "State") submits this opposition to the Rule 12(b)(2) Motion to Dismiss filed by Defendant Evernorth Health, Inc. ("Evernorth").

## INTRODUCTION

For nearly twenty years, Montana diabetics and health plan payors like the State have been increasingly overcharged for necessary diabetes medications due to the unfair and deceptive practices of Evernorth and its co-conspirators. The State of Montana filed suit in Montana state court to put an end to the Defendants' conduct and to recover the overpayments made by the State and Montana diabetics. (*See, e.g.,* ¶¶ 35–38, 521–23, 531).[1] The claims are based on Montana law, including the Montana Unfair Trade Practices and Consumer Protection Act ("MCPA"), and, in part, arise from the Montana Attorney General's sovereign interest in protecting the health and safety of all Montana residents. (¶¶ 39-40).

Evernorth has not disputed the State's allegations regarding its involvement in the Insulin Pricing Scheme or the devastating impact the Scheme has had in Montana. Rather, Evernorth seeks to evade suit in Montana by arguing that its misconduct occurred elsewhere such that this Court lacks jurisdiction over it. (Dkt. 87 at 9). However, Evernorth provided no affidavits or evidence to contest the State's allegations, which are therefore uncontroverted and show that Evernorth

_____

[1] All references in this Memorandum to parenthetical paragraph citations are to citations to the individually number paragraphs of the First Amended Complaint (Dkt. 40).

conducted Scheme-related activities specific to Montana.  The State's allegations against Evernorth extend far beyond its role as a parent company and include Evernorth's own direct involvement in the Scheme and provision of PBM services. Evernorth has sufficient suit-related contacts with Montana to establish jurisdiction, separate and apart from its subsidiaries.

The complaint contains more than sufficient factual allegations of forum-related contacts by Evernorth to support this Court's exercise of jurisdiction over it. The Mississippi court's decision cited by Evernorth (Dkt. 87 at 12), is inapposite because it relates to a different, unrelated entity and because the facts and law under which this Court must assess jurisdiction are different. Further, Evernorth made itself subject to jurisdiction in Montana as a result of its violations of the MCPA. *See* MONT. CODE ANN. § 30-14-111(3) (instructing the State to bring action against nonresident violators without a place of business in Montana in the district court of Lewis and Clark County – where the State initially filed this action).  Under the uncontroverted factual allegations and the law of Montana, this Court has jurisdiction over Evernorth and its Rule 12(b)(2) Motion should be denied.

## FACTUAL AND PROCEDURAL BACKGROUND

Approximately 80,000 Montana residents live with diabetes and, for most of them, insulin, which now costs thousands annually for a single diabetic, can be the difference between life and death.  (¶¶ 1, 4, 230, 255).  An insulin product that was

originally priced at $20 when released in the late 1990s, now ranges between $300 and $700. (¶¶ 13–14). In recent years especially, the price of the drug has skyrocketed. In the last decade alone, insulin prices have increased as much as 1000%. (¶¶ 15, 266, Figs. 2–6).

As a result, one in four diabetics skip or ration critical doses which, in turn, leads to further health complications and additional costs. (¶¶ 30, 267, 293, 454, 472–73, 479, 523). In Montana, the State has spent billions of dollars on increased healthcare costs for diabetes and related complications. (¶¶ 31–34, 293, 472–77, 523).

Tellingly, the drug has not changed in the past 20 years, and there has been little to no innovation in the product itself—today's $350 insulin is the exact drug originally priced at $20. (¶¶ 17, 247–59, 374(b)). In fact, it costs the Manufacturer Defendants less than $2 to make. (¶¶ 14, 517). Normal market forces are not at work. (¶¶ 335–38, 374–75).

### The Insulin Pricing Scheme

The Manufacturer Defendants dominate the diabetes drug market, manufacturing 99% of insulins dispensed in Montana. (¶¶ 5, 246, 263). The Manufacturers also, in coordination with the PBMs, including Evernorth, set the list price for their diabetes drugs. (¶¶ 20, 296, 344). The list price is the basis for the price that nearly every consumer and payor pays for the at-issue drugs. (¶¶ 27, 360).

The PBM Defendants control approximately 80% of the market and manage the pharmacy benefits for the vast majority of Montana residents. (¶¶ 6, 313). In this role, the PBM Defendants establish drug lists called formularies that determine which diabetes drugs are covered and not covered for nearly every payor in Montana. (¶¶ 7, 9, 296, 339). Most prescribing doctors and patients, of course, opt for covered medications. (¶¶ 7–11). PBMs thus effectively control utilization of the at-issue drugs. (¶¶ 6–11, 339). In short, the Manufacturers control the product, the PBMs control the buyers, and collectively these two groups of Defendants control the price paid by nearly every diabetic and payor in Montana, including the State. (¶¶ 335–55, 360).

Knowing the importance of price, volume, and access, the Manufacturers and PBMs work together to maximize their own profits to the detriment of Montana residents and payors like the State. (¶¶ 6–11, 355, 535–37). Given that the PBMs and Manufacturers treat diabetes drugs as interchangeable, formulary inclusion depends on which Manufacturer increases the PBM's bottom lines the most. (¶¶ 22, 247–59, 335, 348, 365–66). The Manufacturers, knowing formulary position directly correlates to sales volume, simply raise their reported prices and then secretly kick back a significant portion of that price to the PBM Defendants (referred to as "Manufacturer Payments"). (¶¶ 10, 20, 301–05, 340, 344, 348, 362–66). The Manufacturers also know that every way the PBMs make money off the at-issue

drugs is directly tied to the inflated list prices. (¶¶ 342, 379, 389). It is a win-win for Defendants: the PBMs make money from the increased prices and the secret kick back payments, while the Manufacturers lock in huge volume and maintain their own profit margins. (¶¶ 23–24, 376–79, 410, 413). The result, however, is unconscionable – the most expensive diabetes drugs end up on the formularies used by most Montana residents and both Montana diabetics and the State end up paying more so the Defendants can profit. (¶¶ 22, 337, 348–50, 355, 365–66).

### *The State's Claims*

The State brought suit in Montana state court against the Manufacturer Defendants and the PBM Defendants, including Evernorth, for violations of MCPA, conspiracy to violate the MCPA and unjust enrichment. (¶¶ 510–37). In addition to suing on its own behalf as payor of State employee health plans and purchaser of the at-issue drugs for State-run facilities, the State sued on behalf of the tens of thousands of Montana residents injured by the Insulin Pricing Scheme. (¶¶ 35, 220-222).

The MCPA prohibits unconscionable and deceptive trade practices in the conduct of trade or commerce within Montana. MONT. CODE ANN. § 30-14-103. The complaint alleges that each Defendant's conduct and involvement in the Insulin Pricing Scheme was both unfair and deceptive in violation of the MCPA and caused injury in Montana to tens of thousands of Montana diabetics and the State. (¶¶ 510–

24).  Each purchase of the at-issue drugs at prices resulting from the Insulin Pricing Scheme, by the State or by any Montana resident, constitutes a separate violation of the MCPA.  (¶ 519).  Because Montana diabetics and the State continue to pay for the at-issue drugs based on the false prices generated by the Insulin Pricing Scheme, the harm is ongoing.  (¶¶ 471, 483).

### *Relevant Jurisdictional Facts*

The complaint sets forth the following uncontroverted facts regarding Evernorth and its involvement in the Insulin Pricing Scheme:[2]

- Evernorth's executives and employees, including its CEO Tim Wentworth, shape policies related to the Insulin Pricing Scheme, including the policies that inform Evernorth's PBM services and formulary construction with respect to the at-issue drugs.  (¶ 129).

- Evernorth is the parent of mail order pharmacy and PBM subsidiaries ("Express Scripts Defendants") that operate throughout Montana.  (¶ 135).

- Evernorth and the Express Scripts Defendants share numerous directors and executives.  Through these shared directors and executives, Evernorth had

---

[2] *See Abbey v. Chubb Corp.*, 2006 WL 8449567, at *1 (D. Mont. Apr. 10, 2006) ("Unless defendants *directly contravene* the plaintiff, the plaintiff's facts are deemed true and in the event of conflicting facts, the plaintiff's facts are favored for purposes of a determination of jurisdiction." (emphasis added) (citation and internal quotation marks omitted)).

direct involvement in the at-issue formulary construction, Manufacturer Payments, and mail order pharmacy services. (¶ 164). Evernorth and the Express Scripts Defendants conduct business in Montana, provide PBM services throughout Montana, and provide mail order pharmacy services throughout Montana. (¶¶ 129-163).

- Evernorth executives and employees regularly communicate with, direct, and control the Express Scripts Defendants related to the at-issue PBM services, formulary activities, Manufacturer Payments, and mail order pharmacy services, including those in Montana, which gave rise to the Insulin Pricing Scheme and injured Montana and the State. (¶¶ 131, 164, 164(e)).

- Repeatedly, continuously, and explicitly throughout the relevant time period, Evernorth represented that it is one of the largest PBMs in North America, is involved in the selection of drugs for its client's formularies, offers home delivery pharmacy services, and works with drug manufacturers. (¶ 137).

- Evernorth is a member of the Pharmaceutical Care Management Association ("PCMA"), the main trade association for PBMs. Indeed, Tim Wentworth, the CEO of Evernorth, served as a member of the PCMA's Board of Directors. (¶ 322–23). Through this leadership position, Evernorth exercises control over the PCMA, which is central to the Insulin Pricing Scheme. (¶¶ 321–24). Evernorth and the other PBM Defendants have utilized the PCMA to further

their interests and to hide the Insulin Pricing Scheme by filing lawsuits and launching lobbying campaigns aimed at blocking drug pricing transparency efforts. (¶ 334).

- Multiple times a year, from at least 2010 to 2019, Evernorth representatives attended PCMA meetings and met privately with each of the Manufacturer Defendants for the purpose of developing and maintaining the Insulin Pricing Scheme. (¶¶ 321, 325, 328, 536). Notably, key at-issue lockstep price increases were made shortly after these Scheme-related meetings. (¶¶ 331–32, 536).

- Throughout the relevant period, Evernorth executives, including its CEO Tim Wentworth, directly engaged with the Manufacturer Defendants in furtherance of the Insulin Pricing Scheme. (¶¶ 129, 132). Each of the Manufacturers has a team of executives dedicated exclusively to interacting with Evernorth. (¶ 132). The Manufacturers and Evernorth, through the intimacy and connection of their leaders, develop and agree on strategic initiatives used to effectuate the Insulin Pricing Scheme. (¶ 133).

- In at least 2013, 2014, and 2015, Evernorth executives met with executives of Manufacturer Eli Lilly to discuss their coordinated efforts related to the at-issue drugs, in furtherance of the Insulin Pricing Scheme. (¶ 134(a)). These executive exchange meetings included Evernorth's CEO, George Paz. (*Id.*).

- In at least 2013 and 2014, leaders of Evernorth also held executive meetings with leaders of Manufacturer Defendant Novo Nordisk to discuss their coordinated efforts related to the at-issue drugs, in furtherance of the Insulin Pricing Scheme. (¶ 134(b)).

- Evernorth's conduct has had a direct effect in Montana and damaged diabetics, the State, and payors in Montana. (¶ 130).

## ARGUMENT

This Court has personal jurisdiction over Evernorth and its Rule 12(b)(2) motion should be denied.

## I.     Legal Standard

A federal court may exercise jurisdiction over an out of state defendant whenever doing so is permitted by the state's long-arm statute and federal due process. *Burri Law PA v. Skurla*, 35 F.4th 1207, 1212 (9th Cir. 2022) (citation omitted). "Case law favors finding personal jurisdiction." *Abbey v. Chubb Corp.*, 2006 WL 8449567, at *1 (D. Mont. Apr. 10, 2006).

Montana's long-arm statute provides for jurisdiction broad enough that it has been said to "permit[] the exercise of personal jurisdiction over nonresident defendants to the maximum extent permitted by federal due process[.]" *Wolves of the Rockies, Inc. v. Stone*, 2022 WL 123770, at *3 (D. Mont. Jan. 13, 2022) (citation omitted). Specifically included in its reach are those who "transact[] . . . any business

within Montana, or who allegedly committed "any act resulting in accrual within Montana of a tort action." MONT. R. CIV. P. 4(b)(1)(A)-(B).

If jurisdiction exists under the statute, the court then determines whether the exercise of personal jurisdiction comports with due process. *Ford Motor Co. v. Montana Eighth Judicial Dist. Ct.,* 443 P.3d 407, 412 (Mont. 2019), aff'd, 141 S. Ct. 1017 (2021). Due Process requires non-resident defendants have "sufficient 'minimum contacts' with the forum state such that the exercising jurisdiction would not offend 'traditional notions of fair play and substantial justice.'" *Burri,* 35 F.4th at 1212 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945)). The Ninth Circuit applies a three-part test when analyzing whether the exercise of specific jurisdiction comports with due process:

> (1)    The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;

> (2)    The claim must be one which arises out of or relates to the defendant's forum-related activities; and

> (3)    The exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

*Schwarzenegger v. Fred Martin Motor Co.,* 374 F.3d 797, 802 (9th Cir. 2004) (citation omitted). "One tortious act, standing alone, may satisfy all three elements [of federal due process] if the act is aimed at a resident of the for[u]m or has an effect

in the forum." *Doverspike v. Murphy*, 2021 WL 3604813, at *4 (D. Mont. Aug. 10, 2021) (Morris, J.) (citation omitted).

To defeat a motion to dismiss for lack of personal jurisdiction, the nonmoving party "need only make a *prima facie* showing of jurisdictional facts." *Dole Food Co., Inc. v. Watts*, 303 F.3d 1104, 1108 (9th Cir. 2002) (citation omitted). In evaluating the *prima facie* showing, the court must accept as true all uncontroverted allegations in the plaintiff's complaint and must resolve all disputed facts in favor of the plaintiff. *Schwarzenegger,* 374 F.3d at 800 (citation omitted).

## II.     The State's Factual Allegations Are Uncontested and Must Be Accepted As True.

Evernorth asserts that this Court cannot exercise jurisdiction over it, (Dkt. 87 at 5), but does not provide any evidence to contradict the allegations in the complaint and, as a result, the allegations must be taken as true. "[J]urisdictional facts are derived largely from the complaint, unless controverted by a declaration or affidavit." *Wolves of the Rockies*, 2022 WL 123770, at *3 (citation omitted). "Unless defendants directly contravene the plaintiff, the plaintiff's facts are deemed true and in the event of conflicting facts, the plaintiff's facts are favored for purposes of a determination of jurisdiction." *Abbey*, 2006 WL 8449567, at *1 (citation and internal quotation marks omitted). *See also Burri*, 35 F.4th at 1213 ("[A] court must accept as true all uncontroverted allegations in the plaintiff's complaint and must resolve all undisputed facts in favor of the plaintiff."). Because no contradictory

affidavit or evidence was submitted, the allegations of the complaint are taken as true. The State's allegations are sufficient to confer jurisdiction.

## III. Based On the Uncontroverted Facts, Montana's Long-Arm Reaches Evernorth For the State's Claims.

### A. Evernorth is subject to Montana's long-arm because it transacted business in Montana.

Under Montana's long-arm, "any person is subject to the jurisdiction of Montana courts as to any claim for relief arising from . . . the transaction of any business within Montana." MONT. R. CIV. P. § 4(b)(1)(A). The long-arm reaches not only those that personally transact business in Montana, but also those that transact business through an employee or agent. MONT. R. CIV. P. § 4(b)(1). The transacting-business prong of the long-arm statute requires "far fewer contacts with the forum state than are necessary to support general jurisdiction on the theory that the defendant is 'doing business' in the forum state." *Milky Whey, Inc. v. Dairy Partners, LLC*, 342 P.3d 13, 18 (Mont. 2015) (quoting 4 Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1069.3 (4th ed. 2022)).

Contrary to Evernorth's assertion, (Dkt. 87 at 9), the State has alleged that Evernorth through its executives and employees is directly involved in the PBM services and formulary construction giving rise to the State's claims for injuries to Montana. (¶¶ 129, 164). As alleged, the PBM services provided by Evernorth throughout the State of Montana are substantial and constitute the transaction of

business in Montana, and Evernorth has not controverted the State's allegations. These allegations are also directly related to the State's claims, because the business transacted by Evernorth *is* the carrying-out of the Insulin Pricing Scheme in Montana.

### B. Evernorth is subject to Montana's long-arm because it committed acts resulting in the accrual of a tort action in Montana.

"To determine whether specific jurisdiction exists for tort claims under Montana's long-arm statute, the Montana Supreme Court directs courts to examine: (1) whether there is a valid claim resulting in accrual of a tort action within Montana; and (2) whether the valid claim for relief arises from the alleged actions." *Doverspike,* 2021 WL 3604813, at *3 (citations omitted).

As detailed above, the State has made numerous allegations – uncontroverted by Evernorth – regarding Evernorth's direct involvement in establishing and executing the Scheme through PBM services and formulary construction (¶¶ 129-34, 322-24). The State specifically alleged the ways in which the Scheme executed by Evernorth in Montana violated the MCPA, caused injury to Montana consumers, and unjustly enriched the Defendants including Evernorth. (¶¶ 510-533). The State's uncontroverted allegations are more than sufficient to state a claim against Evernorth for violations of the MCPA and unjust enrichment – which sound in tort.

The State's claims against Evernorth also include a claim for civil conspiracy. (¶¶ 534-537). Under Montana law, there are five elements required to prove a civil conspiracy:

> (1)    two or more persons (a person may be a corporation); (2) an object to be accomplished; (3) a meeting of the minds on the object; (4) one or more unlawful acts; and (5) damages as to the proximate result.

*Doverspike*, 2021 WL 3604813, at *3 (citation omitted). "A plaintiff can use circumstantial evidence to establish a civil conspiracy." *Id.* (citation omitted). In *Doverspike*, a Montana-registered vehicle was placed under a receivership order pending determination of its rightful owner by a Montana court. *Id.* The plaintiff alleged that the two defendants then conspired to deprive her of the vehicle, by knowingly arranging between themselves to transfer the vehicle from Nevada to Florida and conceal the transfer. *Id.* at *2. Neither the plaintiff nor defendants lived in Montana, the vehicle was not stored in Montana at any point during the dispute, and the co-defendants' transfer and subsequent cover-up all occurred outside the state. *See id.* at *1-2. However, the defendants' actions, based on a meeting of the minds, "potentially deprived" the plaintiff from full relief in her Montana lawsuit. *Id.* at *4. Therefore, this Court found that the tort prong of the Montana long-arm reached the defendants for purposes of the plaintiff's civil conspiracy claim. *Id.*

Here, the State has alleged Evernorth conspired with other defendants to accomplish an agreed object which was unlawful, which was intended to damage

Montana and Montana diabetics, and indeed resulted in damages to Montana and Montana diabetics. Here, as in *Doverspike*, the tort prong of the long-arm statute is satisfied.

The State's uncontroverted facts establish that Montana's long-arm statute reaches Evernorth for purposes of the State's claims.

## IV. The Uncontroverted Facts Satisfy Federal Due Process for Personal Jurisdiction Over Evernorth.

Federal due process requires a defendant have "such contacts with the forum State that the maintenance of the suit is reasonable, in the context of our federal system of government, and does not offend traditional notions of fair play and substantial justice." *Ford Motor Co. v. Mont. Eighth Judicial Dist. Ct.*, 141 S. Ct. 1017, 1024 (2021) (citing *Int'l Shoe*, 326 U.S. at 316–17). "[T]he defendant's conduct and connection with the forum state [must be] such that he should reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980) (citations omitted).

Based on the State's uncontroverted allegations, Evernorth has sufficient minimum contacts with Montana to anticipate being haled into court in Montana, and specific jurisdiction comports with federal due process.[3]

---

[3] The State does not contend that this Court has general jurisdiction over Evernorth.

### A. Evernorth purposefully directed its activities at Montana.

For suits sounding in tort, a purposeful direction analysis is the first prong of the test for due process. *Schwarzenegger*, 374 F.3d at 802. This analysis "usually consists of evidence of the defendant's actions *outside the forum state* that are directed at the forum[.]" *Id.* at 803 (emphasis added). "The Supreme Court has held that due process permits the exercise of personal jurisdiction over a defendant who purposefully direct[s] his activities at residents of a forum, even in the absence of physical contacts with the forum." *Id.* (internal quotations omitted).

The Ninth Circuit applies the three-part "effects test" established in *Calder v. Jones*, 465 U.S. 783 (1984), finding purposeful direction if a defendant: (1) commits an intentional act, (2) expressly aimed at the forum state, that (3) causes harm the defendant knew was likely to be suffered in the forum state[.]" *Burri*, 35 F.4th at 1213. "*Calder* stands for the proposition that purposeful availment is satisfied even by a defendant whose only contact with the forum state is the purposeful direction of a foreign act having effect in the forum state." *Schwarzenegger*, 374 F.3d at 803 (citations and internal quotations omitted).

### 1. Evernorth committed intentional acts.

"The intentional act threshold is not a high bar." *In re Packaged Seafood Prod. Antitrust Litig.*, 338 F. Supp. 3d 1118, 1157 (S.D. Cal. 2018). The Ninth Circuit "construe[s] 'intent' in the context of the 'intentional act' test as referring to

an intent to perform an actual, physical act in the real world, rather than an intent to accomplish a result or consequence of that act." *Schwarzenegger*, 374 F.3d at 806.

As alleged by the State, Evernorth was directly involved in PBM services, formulary construction, mail order pharmacy services, and Manufacturer Payments in furtherance of the Insulin Pricing Scheme, and publicly touted its involvement in those functions, though misrepresenting its aims. (¶¶ 129-31, 137, 164). Evernorth specifically offered PBM services to Montana payors, including the State, created formularies for use in Montana, and dispensed the at-issue drugs in Montana through its mail order pharmacies. (¶¶ 171, 174, 176, 179). This conduct by Evernorth was ongoing throughout the relevant period, and plainly constitutes intentional acts by Evernorth.

The State further alleges that Evernorth was a member of the PCMA and exerted control over the PCMA through PCMA board positions. (¶¶ 322-23). It alleges that the PCMA, under Evernorth's control, brought numerous lawsuits and lobbying campaigns to block drug pricing transparency efforts, and block rebate regulations that would impede the Scheme. (¶ 334). Evernorth engaged in these efforts to conceal the Insulin Pricing Scheme. (*Id.*). These acts by Evernorth are also intentional.

### 2. Evernorth's acts were expressly aimed at Montana.

"The 'express aiming' analysis depends, to a significant degree, on the specific type of tort or other wrongful conduct at issue." *Schwarzenegger*, 374 F.3d at 807. The defendant in *Schwarzenegger* was an Ohio car dealership that ran advertisements in a local Ohio newspaper, using Arnold Schwarzenegger's photo without his permission. *Id.* at 799. Because "[t]he purpose of the Advertisement was to entice Ohioans to buy or lease cars from [defendant] . . . and [defendant] had no reason to believe that any Californians would see it and pay a visit to the dealership[,]" the Ninth Circuit found the defendant's act was expressly aimed at a local market in Ohio, not California. *Id.* at 807.

Evernorth cites *Walden v. Fiore*, 571 U.S. 277 (2014), suggesting that its suit-related conduct does not connect it to Montana. (Dkt. 87 at 8-9). However, the facts of *Walden* are highly distinguishable from the facts alleged here. The defendant in *Walden* was a law enforcement officer working at the Atlanta airport as part of a drug interdiction program. *Walden*, 51 U.S. at 279. The officer, in Atlanta, seized cash of questionable origin from the plaintiffs, who happened to be residents of Nevada traveling through the Atlanta airport. *Id.* at 280. Because the officer had acted entirely in Georgia, in no way targeting Nevada, the Supreme Court held that Nevada lacked jurisdiction. *Id.* at 291.

Here, in direct contrast to *Schwarzenegger* and *Walden,* Evernorth intentionally provided PBM services *to Montanans*, created formularies for use *in Montana*, and dispensed at-issue drugs *to Montanans in Montana.* Evernorth also intentionally, through the PCMA, brought lawsuits and campaigns to perpetuate the Scheme and hide it from the State and Montanans. Each of these intentional acts were expressly aimed at Montana. Whether its intentional acts were also aimed elsewhere is beside the point. *Ford*, 141 S. Ct. at 1027 (explaining that if a company's business deliberately extended into a particular state, that state's courts may exercise jurisdiction, even if the company's business *also* deliberately extended into other states).

### 3. Evernorth knowingly caused harm in Montana.

The final prong of the effects test "asks whether [the defendant] knew or should have known that his actions were likely to cause [] harm in the forum state." *Burri*, 35 F.4th at 1215. Evernorth cannot reasonably deny knowledge that its conduct in providing PBM services, constructing formularies, dispensing the at-issue drugs, and blocking transparency, was likely to cause harm to Montanans, in Montana, through falsely inflated prices which the State and diabetic Montanans were forced to pay. Indeed, its acts were *designed* to have that effect, and Evernorth profited from the harm to Montanans – "the traditional quid pro quo justification for finding purposeful availment[.]" *Schwarzenegger*, 374 F.3d at 803.

Because Evernorth purposefully directed its activities at Montana, the first factor of the federal due process analysis is satisfied.

**B.  Evernorth's contacts with Montana directly relate to the State's claims against it.**

The second factor, relatedness, is also met.  The *Ford* Court recently reiterated that a defendant's in-state contacts need only "relate to" the litigation—a causative relationship is not necessary. *Ford,* 141 S. Ct. at 1026.  Here, Evernorth through its work as a Montana PBM utilized the false prices arising from the Insulin Pricing Scheme and knowingly insisted that Montana payors, including the State, pay for the at-issue drugs on the basis of those prices, while concealing its role in the generation of the prices.  (¶¶ 171-175).  The State's claims against Evernorth directly relate to its contacts with Montana.

As the United States Supreme Court recently clarified, a company "purposefully availing itself" of a certain market in a particular state "has clear notice of its exposure in that State" to lawsuits related to harms caused by that product or conduct. *See Ford*, 141 S. Ct. at 1027.  Put another way, if a suit arises from efforts by a company "to serve, *directly or indirectly*, the market for its product in several or all other States, it is not unreasonable to subject it to suit in one of those States" if its product (or service) causes an injury.  *Id.* (emphasis supplied) (quoting *World-Wide Volkswagen*, 444 U.S. at 297).

Here, the allegations of the complaint make clear that Evernorth acted in Montana, and successfully exploited the Montana market for its financial gain. By serving as a PBM in Montana, and doing so in furtherance of the Insulin Pricing Scheme, Evernorth played an active role in causing the harm underlying the State's claims, and had clear notice that it would be subject to the state's jurisdiction.

### C. This Court's exercise of specific jurisdiction over Evernorth for the State's claims is imminently reasonable.

It is Evernorth's burden to "present a compelling case that exercise of jurisdiction would not be reasonable." *Schwarzenegger*, 374 F.3d at 802 (internal quotations omitted). It cannot do so. In the Ninth Circuit, seven factors are evaluated to determine whether the exercise of personal jurisdiction is reasonable:

> (1) the extent of the defendant's purposeful interjection into Montana; (2) the burden on defendant of defending in Montana; (3) the extent of the conflict with the sovereignty of another possible forum state; (4) Montana's interest in adjudicating the dispute; (5) the most efficient judicial resolution of the controversy; (6) the importance of Montana to plaintiff's interest in convenient and effective relief; and (7) the existence of an alternative forum.

*Duffy v. Kaman Aerospace Corp.*, 590 F. Supp. 3d 1317, 1327 (D. Mont. 2022) (Morris, J.) (quoting *Abbey*, 2006 WL 8449567, at *3).

Here, Evernorth purposefully interjected itself into Montana in order to profit from the Montana market, as discussed above (factor 1). There is no burden on Evernorth to defend in this forum: Evernorth's corporate family ranks 13th on the Fortune 500 list, Evernorth's business is national in scope, and it shares counsel in

this matter with its co-defendant subsidiaries that do not contest personal jurisdiction (factor 2). Maintenance of the suit in this Court poses no conflict with the sovereignty of any possible forum state (factor 3). On the other hand, Montana has a strong – indeed, exclusive – interest in adjudicating this dispute, given that it is brought by Montana's Attorney General, under the Montana Unfair Trade Practices and Consumer Protection Act, for injuries caused to diabetic Montanans and the State of Montana (factor 4). Efficient resolution is best served by adjudication of the claims against Evernorth with the claims against the other Defendants, including Evernorth's affiliates that do not contest the Court's jurisdiction, rather than forcing the State to pursue its claims against Evernorth separately in a different forum (factor 5). For all these reasons, adjudication of this matter in Montana is important to the State's interest in convenient and effective relief (factor 6). Finally, there is no alternative forum better suited to adjudicate this case (factor 7).

The State's uncontroverted allegations are more than adequate to afford this Court personal jurisdiction over Evernorth in this matter.

## V. Alternatively, the State is Entitled to Jurisdictional Discovery Regarding Evernorth's Montana Contacts, Involvement in the Scheme, and Corporate Structure.

If this Court finds the State falls short of making its required showing of personal jurisdiction, the State has, at a minimum, shown enough to warrant jurisdictional discovery related to Evernorth's involvement in the Insulin Pricing

Scheme. Evernorth attempts to obfuscate and minimize its role in the Pricing Scheme by asserting that it is merely "a holding company." (Dkt. 87 at 5). But currently, any information that would further illuminate Evernorth's role in the Scheme and the corporate relationship or lack of corporate separateness between Evernorth and the Express Scripts entities is in the sole possession of Evernorth.

"Jurisdictional discovery 'should ordinarily be granted where pertinent facts bearing on the question of jurisdiction are controverted or where a more satisfactory showing of the facts is necessary.'" *First Nat'l Bank of Sioux Falls v. Estate of Carlson*, 448 F. Supp. 3d 1091, 1108 (D. Mont. 2020) (citation omitted). A district court, in fact, abuses its discretion if it denies discovery when the "record is simply not sufficiently developed to enable" a determination on personal jurisdiction. *Harris Rutsky & Co. Ins. Servs. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1135 (9th Cir. 2003).

Far from conclusively refuting the existence of personal jurisdiction, Evernorth's response that it is a holding company fails to address myriad allegations made by the State. Limited discovery is needed to ascertain specific, discrete facts such as:

- Evernorth's involvement, which it has previously acknowledged, in selecting pharmacy benefit plans and drug schedules, including those that service Montana's citizens;

- Evernorth's participation and influence over the PCMA, which the State believes is at the center of the Scheme;

- How Evernorth executives and employees shape and direct policies and strategic goals that guide Express Scripts PBM services;

- Evernorth's communications and coordination with Manufacturer Defendants at specific executive meetings of which the State is aware, including meetings in 2013, 2014, and 2015.

Throughout this Response, the State has established that this Court may exercise personal jurisdiction over Evernorth because it, individually, has sufficient minimum contacts with Montana and falls within Montana's long-arm statute. Yet, if this Court decides otherwise, it is appropriate to allow a limited period of jurisdictional discovery to accurately assess Evernorth's involvement in the Insulin Pricing Scheme in Montana.

## CONCLUSION

For all the reasons discussed above, the State of Montana respectfully requests this Court deny Evernorth's Rule 12(b)(2) Motion to Dismiss for lack of personal jurisdiction.

RESPECTFULLY SUBMITTED this the 31st day of March, 2023.

*/s/ Jennifer M. Studebaker*
Jennifer M. Studebaker
Forman Watkins & Krutz LLP
210 East Capitol Street, Suite 2200

Jackson, Mississippi 39201
Telephone: (601) 960-8600
Fax: (601) 960-8613
jennifer.studebaker@formanwatkins.com

/s/ *Tanya D. Ellis*
Tanya D. Ellis (*Admitted pro hac vice*)
Forman Watkins & Krutz LLP
210 East Capitol Street, Suite 2200
Jackson, Mississippi 39201
Telephone: (601) 960-8600
Fax: (601) 960-8613
tanya.ellis@formanwatkins.com

/s/ *Anna Schneider*
Anna Schneider
Bureau Chief, Office of Consumer Protection
Montana Department of Justice
P.O. Box 200151
Helena, Montana 59620-0151
Telephone: (406) 444-4500
anna.schneider@mt.gov

/s/ *W. Lawrence Deas*
W. Lawrence Deas (*Admitted pro hac vice*)
Liston & Deas, PLLC
605 Crescent Boulevard
Ridgeland, Mississippi 39157
Telephone: (601) 981-1636
lawrence@listondeas.com

/s/ *Matthew C. McDonald*
Matthew C. McDonald (*Admitted pro hac vice*)
David Nutt & Associates, PC
605 Crescent Boulevard
Ridgeland, Mississippi 39157
Telephone: (601) 898-7302
mattm@davidnutt.com

/s/ *Josh Wackerly*
Josh Wackerly (*Admitted pro hac vice*)
The Cicala Law Firm PLLC
101 College Street
Dripping Springs, Texas 78620
Telephone: (512) 275-6550
josh@cicalapllc.com

**Attorneys for Plaintiff**

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1(d)(2), I hereby certify that the lines in this document are double spaced, that the type in this document is proportionally spaced and is in 14-point font, and that this document consists of a total of 5,610 words, excluding the table of contents, table of citations, certificate of service, and certificate of compliance.

/s/ *Tanya D. Ellis*
Tanya D. Ellis

## CERTIFICATE OF SERVICE

I hereby certify that on March 31, 2023, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record.

/s/ *Tanya D. Ellis*
Tanya D. Ellis