Elizabeth W. Lund
BERG LILLY, PC
1 West Main Street
Bozeman, MT 59715
T: 406-587-3181
F: 406-587-3240
lund@berglawfirm.com

William D. Coglianese (*pro hac vice*)
Shirlethia V. Franklin (*pro hac vice*)
Theresa C. Martin (*pro hac vice*)
JONES DAY
51 Louisiana Avenue NW
Washington, DC 20001
T: 202-879-3939
F: 202-646-1700
wcoglianese@jonesday.com
sfranklin@jonesday.com
tcoughlin@jonesday.com

# IN THE UNITED STATES DISTRICT COURT
## FOR DISTRICT OF MONTANA
## HELENA DIVISION

| | |
|---|---|
| THE STATE OF MONTANA, *ex rel.*, AUSTIN KNUDSEN, ATTORNEY GENERAL,<br><br>       *Plaintiff*,<br><br>   v.<br><br>ELI LILLY AND COMPANY, *et al.*,<br><br>       *Defendants*. | Case No. 6:22-cv-00087-BMM<br><br>**ELI LILLY AND COMPANY, NOVO NORDISK INC., AND SANOFI-AVENTIS U.S. LLC'S REPLY IN SUPPORT OF RULE 12(b)(6) MOTION TO DISMISS THE FIRST AMENDED COMPLAINT** |

# TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................................................1

ARGUMENT .........................................................................................................2

I.    The Claims Are All Untimely. .......................................................................2

II.    The Claims All Fail On The Merits.................................................................8

        A.    The Opposition Confirms That The State Has Not Adequately Alleged Any MUTPCPA Violation. ....................................................8

                1.    The Opposition identifies no deceptive practice. .......................8

                2.    The Opposition identifies no unfair trade practice. ..................13

        B.    The Opposition Confirms The Lack Of An Unjust-Enrichment Claim. ................................................................................................14

        C.    The Opposition Confirms That The State Has Not Adequately Alleged A Civil-Conspiracy Claim. ....................................................15

CONCLUSION ......................................................................................................18

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Anderson v. Boyne USA, Inc.*,
2022 WL 2528242 (D. Mont. July 7, 2022) ..................................................6, 7

*Anderson v. Boyne USA, Inc.*,
2023 WL 2161413 (D. Mont. Feb. 22, 2023) ....................................................6

*Associated Mgmt. Servs., Inc. v. Ruff*,
424 P.3d 571 (Mont. 2018) ............................................................................15

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ..................................................................................16, 17

*De Gorter v. FTC*,
244 F.2d 270 (9th Cir. 1957) ........................................................................10

*DRAM Indirect Purchaser Antitrust Litig. v. Samsung Elecs. Co.*,
28 F.4th 42 (9th Cir. 2022) ............................................................................17

*FTC v. Am. Fin. Benefits Ctr.*,
324 F.Supp.3d 1067 (N.D. Cal. 2018) ............................................................11

*Giant Food, Inc. v. FTC*,
322 F.2d 977 (D.C. Cir. 1963) ......................................................................10

*Gomez v. State*,
975 P.2d 1258 (Mont. 1999) ............................................................................6

*Hardy v. Progressive Specialty Ins. Co.*,
67 P.3d 892 (Mont. 2003) ..............................................................................14

*Harris Cnty. v. Eli Lilly & Co.*,
2020 WL 5803483 (S.D. Tex. Sept. 29, 2020) ..............................................16

*Harris Cnty. v. Eli Lilly & Co.*,
2022 WL 479943 (S.D. Tex. Feb. 16, 2022) ..................................................15

*Hein v. Sott*,
353 P.3d 494 (Mont. 2015) ..............................................................................7

*Helbros Watch Co. v. FTC*,
310 F.2d 868 (D.C. Cir. 1962) ....................................................................9, 10

*In re Finjan Holdings, Inc. Secs. Litig.*,
58 F.4th 1048 (9th Cir. 2023) ........................................................................13

*In re Graphics Processing Units Antitrust Litig.*,
 527 F.Supp.2d 1011 (N.D. Cal. 2007) ................................................................18

*In re Insulin Pricing Litig.*,
 2019 WL 643709 (D.N.J. Feb. 15, 2019) ...........................................................16

*In re Jarvar*,
 422 B.R. 242 (Bankr. D. Mont. 2009) ..................................................................7

*In re Musical Instruments & Equip. Antitrust Litig.*,
 798 F.3d 1186 (9th Cir. 2015) ............................................................................17

*Kendall v. Visa U.S.A., Inc.*,
 518 F.3d 1042 (9th Cir. 2008) ......................................................................16, 17

*Linder v. Missoula Cnty.*,
 824 P.2d 1004 (Mont. 1992) .................................................................................8

*Mississippi ex rel. Fitch v. Eli Lilly & Co.*,
 2022 WL 3222890 (S.D. Miss. Aug. 9, 2022) ....................................................16

*Morris v. Walmart, Inc.*,
 2023 WL 1869385 (D. Mont. Jan. 23, 2023) ........................................................8

*Pfau v. Mortenson*,
 858 F.Supp.2d 1150 (D. Mont. 2012) .................................................................14

*Raifman v. Wells Fargo Advisors, LLC*,
 2014 WL 12013436 (N.D. Cal. Mar. 31, 2014) ....................................................5

*Regina Corp. v. FTC*,
 322 F.2d 765 (3d Cir. 1963) ...............................................................................10

*Spiegel, Inc. v. FTC*,
 411 F.2d 481 (7th Cir. 1969) ..............................................................................10

*Thorman v. Am. Seafoods Co.*,
 421 F.3d 1090 (9th Cir. 2005) ..............................................................................2

*Trs. For Alaska Laborers-Constr. Indus. Health & Sec. Fund v. Ferrell*,
 812 F.2d 512 (9th Cir. 1987) .............................................................................6, 7

*Weiss v. La Suisse, Societe D'Assurances Sur La Vie*,
 381 F.Supp.2d 334 (S.D.N.Y. 2005) ....................................................................5

*Welu v. Twin Hearts Smiling Horses, Inc.*,
 386 P.3d 937 (Mont. 2016) .................................................................................15

*Young v. Era Advantage Realty*,
 513 P.3d 505 (Mont. 2022) .................................................................................13

**STATUTES**

42 U.S.C. § 1395w-3a ..............................................................9, 11, 12, 13

Mont. Code Ann. § 33-2-2402 .............................................9, 11, 12, 18

**OTHER AUTHORITIES**

Mont. R. Civ. P. 9 ...............................................................................8, 13

Andrew Schneider, *Insulin price spike leaves diabetes patients in crisis*, BILLINGS GAZETTE (Aug. 21, 2016)....................................................3

Katie Thomas, *Drug Prices Keep Rising Despite Intense Criticism*, N.Y. TIMES (Apr. 26, 2016)................................................................................4

**INTRODUCTION**

The State's Opposition ("Opp.," ECF 112), confirms that its claims are untimely. The State cannot deny that the so-called "essential" facts underlying its claims—the Manufacturers' raising of insulin list prices due to the increasing rebates they must pay PBMs—were well-known long before the earliest possible cut-off date governing those claims. And it cannot explain how it exercised the diligence necessary to toll the limitations periods, especially given that its complaint parrots lawsuits filed by other plaintiffs years ago. Because the claims' untimeliness is clear on the face of the Complaint, settled law requires dismissal.

The Opposition also confirms that the State fails to allege any claim against the Manufacturers. Its core theory is that insulin list prices were deceptive because they became too "untethered" from the Manufacturers' net profits, due to rebates that the Manufacturers paid PBMs. That claim could work only if the Manufacturers ever represented that their list prices *do* bear some relationship to their net profits— but the State makes no such allegation. That is unsurprising: list prices that reflect net profits would violate federal and Montana laws *forbidding* list prices from including the rebates that cause list and net prices to diverge. The State thus posits a theory of deception without alleging that any Manufacturer made any deceptive representations. And the State hardly defends its alternative unfairness theory, offering no explanation of how the Manufacturers' *lawful* reporting of list prices could violate

public policy or otherwise be unfair. Whether under a deception or unfairness theory, the State's MUTPCPA claim fails.

So do its common-law claims. As to unjust enrichment, the State cannot deny that it has an adequate remedy at law; cannot identify any basis for implying a contract with the Manufacturers; and cannot allege that the Manufacturers unjustly gained anything through a "scheme" that left their net prices *flat*. The civil-conspiracy claim fails, too. In its Opposition, the State suggests that this claim alleges a vast price-fixing conspiracy. That argument improperly transforms the Complaint's civil-conspiracy claim, which is expressly derivative of the underlying MUTPCPA and unjust-enrichment claims. Regardless, the State alleges nothing but independent, economically rational behavior.

The Court should dismiss all claims against the Manufacturers.

## ARGUMENT

## I.    The Claims Are All Untimely.

The State tellingly waits until the end of its Opposition to address the "threshold" issue of timeliness (*Thorman v. Am. Seafoods Co.*, 421 F.3d 1090, 1099 (9th Cir. 2005); Opp. 33-44), and fails to salvage any claim as timely. Indeed, the State effectively concedes that, unless a tolling doctrine applies, it is (at a minimum) barred from recovering for supposed injuries stemming from conduct before September 2019 (for its MUTPCPA claim) or September 2020 (for its unjust-enrichment

claim). Opp. 43-44. But no tolling doctrine applies—unsurprisingly, given the State's insistence that the supposedly long-running deception here was "stark" (*id.* 4)—and the State has no basis to recover even for injuries occurring in the two to three years preceding its belated lawsuit.

*First*, discovery-rule tolling does not apply. The State's arguments prove only that the drug-pricing practices at issue have been open and well-known for years, and that the State could have discovered its claim years ago through ordinary diligence. Mfrs.' Br. In Support Of MTD ("Br.") 14-19 (ECF 85). The State claims it could not have discovered the "causal connection" between the Manufacturers' payment of rebates and "escalating insulin prices" before reading a 2021 Senate committee report regarding insulin pricing. Opp. 35, 39; Compl. ¶¶ 342-43. But all that the State claims the report revealed—that "rebates demanded by the PBMs," rather than "research and development costs or other legitimate market forces," have been "the primary culprit" behind rising insulin prices, Opp. 39—was repeatedly disclosed long before then:

- As early as 2009, the Manufacturers were disclosing that they had to pay significant rebates to secure formulary access for their insulin products. Br. 17-18.

- Throughout the 2010s, national and Montana news media reported these same dynamics. *Id.*; s*ee, e.g.*, Andrew Schneider, *Insulin price spike leaves diabetes patients in crisis*, BILLINGS GAZETTE (Aug. 21, 2016) (ECF 88-2) ("Most professionals on the front lines blame the snowballing costs on the almost complete lack of regulation of phar-

macy benefit managers."); Katie Thomas, *Drug Prices Keep Rising Despite Intense Criticism*, N.Y. TIMES (Apr. 26, 2016) (ECF 88-3) ("[D]rug list prices don't show the rebates and other discounts that insurers and pharmacy-benefit managers demand from manufacturers ….").

- Starting in 2017, a series of plaintiffs filed lawsuits asserting the same theory of wrongdoing as the State asserts here. Br. 16-17.

- During public April 2019 Congressional proceedings, representatives of each Manufacturer testified that insulin prices were being driven higher by the PBMs' demand for increasing rebates. *Id.* 15; Compl. ¶¶ 362-64.

The State cannot deny that these sources revealed the very facts that it deems "essential" to informing it of its claims. Opp. 39. Indeed, the Complaint itself characterizes the Manufacturers' April 2019 congressional testimony—delivered months before the earliest relevant cut-off date—as "admit[ting] that they … participate[d] in the Insulin Pricing Scheme." Compl. ¶ 361. The State never explains why it waited *more than three years* after those supposed admissions to bring suit. Nor does it explain why it was aware of some Congressional activity in 2021, but not other well-publicized Congressional activity—on the *same topic*—two years earlier. There is nothing "extraordinary" (Opp. 37) about the diligence it would have taken the State to timely file suit.

Nor can the State explain why many other plaintiffs managed to file functionally identical suits long before it copied them—a period going back *six years* before this case. Courts have recognized that an ordinarily diligent plaintiff would be aware

of lawsuits asserting an identical theory of wrongdoing. *See, e.g.*, *Raifman v. Wells Fargo Advisors, LLC*, 2014 WL 12013436, at *10 (N.D. Cal. Mar. 31, 2014) ("[A] reasonable electronic search within the limitations period would have revealed other lawsuits alleging that Wachovia engaged in fraud."); *Weiss v. La Suisse, Societe D'Assurances Sur La Vie*, 381 F.Supp.2d 334, 339 (S.D.N.Y. 2005) ("It is well settled that the filing of a lawsuit by private parties puts plaintiffs with identical claims on notice of their potential claims."). That is particularly true here, where the State's claims are not merely similar to those prior complaints—the State essentially copies and pastes from them, plugging in some Montana-specific assertions but little else. Br. 16-17. But even setting aside whether those other complaints were independently sufficient to put the State on notice, other plaintiffs' ability to bring identical claims years ago is obviously relevant to whether the State could have done the same.

**Second**, fraudulent concealment and estoppel are similarly inapplicable, given the State's lack of diligence and its failure to allege that the Manufacturers concealed anything. Br. 19-20. In response, the State fails to defend its estoppel allegations, conceding that point. And it confirms that its argument for fraudulent-concealment tolling tracks its argument for discovery-rule tolling, meaning the argument fails for the same reasons. Opp. 39-40.

**Third**, the continuing-violation doctrine has no application, either. The State does not argue that the doctrine preserves claims that accrued before the statutory

cut-off dates. Rather, it contends only that the doctrine permits recovery for injuries since September 2019 or September 2020 (depending on the claim). Opp. 40-41.

Even that goes too far. The State concedes that the continuing-violation doctrine "typically involves nuisance or trespass claims." *Id.* 40. Despite asking the Court to extend that doctrine here, it recognizes that such an extension is inappropriate where a plaintiff has "slept on his rights." *Id.* 41 (quoting *Gomez v. State*, 975 P.2d 1258, 1263 (Mont. 1999)). Because that is exactly what happened here (*supra* 3-5), the State "should not be rewarded under the law for [its] lack of diligence." *Gomez*, 975 P.2d at 1263.

This Court's decision in *Anderson v. Boyne USA, Inc.* is not to the contrary. 2023 WL 2161413 (D. Mont. Feb. 22, 2023) ("*Anderson II*"); *contra* Opp. 40. That case involved fraudulent concealment, not the continuing-violations doctrine. 2023 WL 2161413, at *3-4. And the Court rejected the defendants' timeliness argument based on the fiduciary relationship between the parties (*id.* at *4), whereas the State (rightly) does not assert any such relationship here.

Moreover, *Anderson II*'s reference to "continuing torts" has no bearing here. *Id.* That reference was to an earlier order rejecting a timeliness argument where the plaintiffs alleged "a series of partial breaches" of their contracts with the defendant that "continued to accumulate." *Anderson v. Boyne USA, Inc.*, 2022 WL 2528242, at *2 (D. Mont. July 7, 2022) ("*Anderson I*") (first quotation quoting *Trs. For Alaska*

*Laborers-Constr. Indus. Health & Sec. Fund v. Ferrell*, 812 F.2d 512, 517 (9th Cir. 1987)). *Anderson I* was grounded not in any tolling doctrine, but rather in the fact that a "failure" to comply with "a contract which requires continuing performance" on a monthly basis "results in a *new* breach every month." *Ferrell*, 812 F.2d at 517 (emphasis added). But the State makes no breach-of-contract claim. The *Anderson* decisions thus do not support the State's attempt at extending the continuing-violation doctrine beyond its limitation to nuisance and trespass cases.

**Fourth**, the State argues that, regardless of tolling, it can at least recover for injuries arising from conduct within the past two or three years. Opp. 41-44. Not so. The State relies on cases where defendants engaged in *new* forms of unlawful conduct within the limitations period. *See Hein v. Sott*, 353 P.3d 494, 498 (Mont. 2015) ("Hein's [MUTPCPA] claims were not limited to the 2001 construction of his home, but alleged that Sott deceptively represented that he had performed successful repairs."); *In re Jarvar*, 422 B.R. 242, 252 (Bankr. D. Mont. 2009) (defendant sought to collect on a note in violation of the MUTPCPA). But the State does not claim that anything changed in recent years. Indeed, it alleges that the Manufacturers have engaged in the *same* conduct "[o]ver the course of the last fifteen years." Compl. ¶ 13.

As such, even the State's requested truncated recovery period is unavailable. The point of limitations periods is "to provide a reasonable period of time in which wronged parties can initiate suit and obtain redress," without defendants having to

worry about "causes of action forever lurking in the distance." *Linder v. Missoula Cnty.*, 824 P.2d 1004, 1007 (Mont. 1992). That objective applies with full force here.

## II. The Claims All Fail On The Merits.

The State's Opposition confirms that its claims fail on the merits, too.

### A. The Opposition Confirms That The State Has Not Adequately Alleged Any MUTPCPA Violation.

The State fails to show that the Complaint plausibly alleges that the Manufacturers committed "deceptive" and "unfair" acts under the MUTPCPA.

#### 1. The Opposition identifies no deceptive practice.

The State devotes nearly all of its efforts to its deception claim. Those efforts fail for the fundamental reason that the State cannot allege *any* misrepresentation—let alone with the Rule 9(b) particularity that it concedes is required. Opp. 9.[1]

**a.** Liberated from its adjectives (e.g., "artificial," "inflated," "fictitious"), the State's theory is that the Manufacturers' list prices (their WACs) "were so untethered from the actual prices received by the Manufacturers as to be false." Opp. 6. That so-called "untether[ing]" happens because the Manufacturers "pay PBMs significant sums in the form of rebates and other [payments] to ensure" formulary placement, forcing them to raise their list prices even while their net prices—what the State calls "actual prices"—remained flat. *Id.* 3, 6, 26.

---

[1] The State does not deny its failure to plead a fraudulent-omission theory, and thus has waived any such theory. *E.g.*, *Morris v. Walmart, Inc.*, 2023 WL 1869385, at *5 (D. Mont. Jan. 23, 2023); *see also* Br. 25-26.

That theory of deception thus relies on the idea that the Manufacturers held out their list prices as being "tethered" to their net prices. Without that representation, there could be no deception. But the State never alleges that any Manufacturer *ever* made any such representation. The core ingredient of a deception claim—a deceptive representation—is simply absent here.

That absence is unsurprising. Each Manufacturer sets a single WAC for each of its drugs. Compl. ¶ 286. That WAC must comply with federal law, which requires such prices to "*not* includ[e] prompt pay or *other discounts, rebates, or reductions in price*." 42 U.S.C. § 1395w-3a(c)(6)(B) (emphasis added). And Montana recently incorporated that definition into state law. Mont. Code Ann. § 33-2-2402(14). This definition bars any Manufacturer from claiming that its published WAC prices are tethered to its net profits, since any rebate it pays—which would cause the "untether[ing]" that the State finds objectionable—*cannot* be reflected in the WAC. A manufacturer who represented that there *is* any such tethering would be declaring that its WAC violates federal and Montana law.

**b.** Against this backdrop, the State's "fictitious pricing" cases are all inapposite. Opp. 14-15. Those cases involved defendants publishing "a retail price substantially higher than the actual price to the consumer," and using that false list price to induce consumers to buy the product at an illusory "bargain" price. *Helbros Watch Co. v. FTC*, 310 F.2d 868, 869 (D.C. Cir. 1962). The pricing systems were

thus "so arranged that the customer was given the false impression that he was purchasing [a product] at a reduced price." *De Gorter v. FTC*, 244 F.2d 270, 281 (9th Cir. 1957).[2]

The State alleges nothing of the sort here. It does not—and cannot—claim that the Manufacturers ever implied that WAC "is the usual and regular price" that patients pay for insulin. *Helbros*, 310 F.2d at 869. Nor does it claim that the Manufacturers' published WAC prices were anything other than what the federal definition requires: the list price to wholesalers, *not* including rebates or other discounts. Instead, the State rests on the question-begging contention that "the reported [WAC] prices are false"—without any claim that the Manufacturers' statutorily defined list prices were ever anything other than what they reported. Opp.

---

[2] *See Helbros*, 310 F.2d at 869 (manufacturer provided "price tag" with the false "implication that the amount listed thereon is the usual and regular price" at retail); *Spiegel, Inc. v. FTC*, 411 F.2d 481, 483 (7th Cir. 1969) (defendant falsely advertised offer as "an unusual opportunity in comparison with previous prices"); *Giant Food, Inc. v. FTC*, 322 F.2d 977, 980 (D.C. Cir. 1963) (retailer "represented that the particular product was 'usually and customarily sold at retail' at such price, when in fact the represented price was 'substantially in excess of' the usual and customary retail price"); *Regina Corp. v. FTC*, 322 F.2d 765, 767-68 (3d Cir. 1963) (manufacturer "represented its 'suggested list prices' as the usual and customary prices although it 'was aware that the usual and customary prices for its products were generally lower'"); *De Gorter*, 244 F.2d at 281 (advertisements "listed high, apparently former prices ('values up to'), and reduced prices ('now')," leading "the customer to believe that he was 'picking up' a bargain which, in reality he was not").

6 n.7.[3] There is nothing fictitious or deceptive about publishing WAC prices that reflect exactly what the law requires.[4]

    **c.**    The State tries salvaging its claim with arguments over the federal WAC definition. This failing effort only underscores the fundamental defects in its theory.

    ***First***, the State dismisses the federal definition as "found in a Medicare payment methodology statute." Opp. 21. That might matter if the Manufacturers set different list prices for Medicare than for other channels. They do not: As the State recognizes, drug manufacturers set a single list price that they "self-report … to publishing compendiums … who then publish that price." Compl. ¶¶ 286-87. The list prices at issue here thus must comply with the definition in § 1395w-3a. And the State's reliance on other insulin-pricing cases that solely discussed the federal definition is inapt here, given that Montana has expressly adopted the federal definition *outside* the Medicare context. Mont. Code Ann. § 33-2-2402(14). The State essentially ignores this clear directive from its own legislature—in the specific context of regulating PBMs—that list prices must exclude rebates.

---

[3] In fact, the State never alleges that the Manufacturers' WAC prices were directed to or seen by consumers or the State, further distinguishing its claims from its cited "fictitious pricing" cases.

[4] *FTC v. American Financial Benefits Center*, 324 F.Supp.3d 1067 (N.D. Cal. 2018) (cited at Opp. 15), is even further afield. Those defendants collected fees from consumers and represented—falsely—that they would enroll them in loan-reduction programs. *Id.* at 1072. That bears no resemblance to this case, as the State fails to allege *any* representation to consumers (*supra* n.2), let alone a *mis*representation.

***Second***, the State argues that § 1395w-3a "does not capture all of the other forms of remuneration involved in the Insulin Pricing Scheme," beyond rebates. Opp. 22. But the statute provides that the WAC shall not include "prompt pay or *other discounts*, rebates *or reductions in price*." 42 U.S.C. § 1395w-3a(c)(6)(B) (emphasis added). So the Manufacturers are similarly foreclosed from reporting WAC prices that reflect "other forms of remuneration" that they pay PBMs.

***Third***, the State contends that § 1395w-3a addresses only discounts or rebates extended to wholesalers or other direct purchasers, not to PBMs. Opp. 22-23. That is not what the statute says. It states that WAC is "the manufacturer's list price for the drug or biological to wholesalers or direct purchasers in the United States," but then requires excluding *all* "discounts, rebates or reductions in price" from that list price, regardless of recipient. The State never explains the logic in excluding from list prices rebates or discounts extended *to wholesalers*, but including rebates and discounts extended *to other entities*. And indeed, Montana adopted the federal definition in the PBM Oversight Act—a statute that regulates PBMs and their handling of rebates. Mont. Code Ann. § 33-2-2402(14).

***Finally***, the State insists that § 1395w-3a's command to "not includ[e]" rebates in the WAC means rebates must be *incorporated* into the WAC. Opp. 23-24. The State is turned around: accounting for rebates in that way, and thus reducing a WAC price to reflect a Manufacturer's net price after paying rebates, would be

"including" rebates—exactly what § 1395w-3a prohibits.

**d.** The inadequacy of the deception allegations becomes even clearer under Rule 9(b)'s heightened standard. The State effectively concedes—as it must—that Rule 9(b) applies to claims under state analogs of the FTC Act when those claims sound in deception. Opp. 9; *see, e.g.*, *In re Finjan Holdings, Inc. Secs. Litig.*, 58 F.4th 1048, 1057 (9th Cir. 2023) ("Rule 9(b) applies where a claim is grounded in fraud or sounds in fraud …."). But the State cannot satisfy Rule 9(b). Indeed, in three pages listing the allegations that supposedly meet that Rule's bar, the State does not include *any* claim that the Manufacturers represented their WAC prices as somehow "tethered" to the "actual prices received by the Manufacturers." Opp. 6. There is thus no deception to speak of, let alone any pleaded with particularity.

## 2. The Opposition identifies no unfair trade practice.

The unfairness theory fails, too. The State recognizes that it must allege a practice that is both "contrary to established public policy *and* which is either immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." *Young v. Era Advantage Realty*, 513 P.3d 505, 513 (Mont. 2022); Opp. 19-20. And by addressing this theory exclusively within its section on Rule 9(b), it implicitly concedes that it must allege this theory with particularity.

It has not done so. The two paragraphs that the State spares for this theory merely rehash the Complaint's conclusory allegations. Opp. 20. But it never explains

how the Manufacturers' conduct—publishing WAC prices that diverge from their net prices—could be contrary to public policy, when federal and Montana law *require* excluding rebates and discounts (which are inherently profit-reducing) from the WAC. Br. 29-30. Compliance with that "established public policy" is not unfair. *See Hardy v. Progressive Specialty Ins. Co.*, 67 P.3d 892, 898 (Mont. 2003) ("As a general rule, the Montana public policy is prescribed by the legislature through its enactment of statutes." (citation omitted)).

### B. The Opposition Confirms The Lack Of An Unjust-Enrichment Claim.

The Opposition confirms that the unjust-enrichment claim fails, too.

*First*, the State concedes—as it must—that unjust enrichment is unavailable when there is an adequate remedy at law. Opp. 27. Its only response is to invoke "the statutory rights granted to the Attorney General by the MCPA." *Id.* That is a non sequitur. The unjust-enrichment claim is equitable; it does not arise under the MUT-PCPA. *Pfau v. Mortenson*, 858 F.Supp.2d 1150, 1161 (D. Mont. 2012), *aff'd*, 542 F. App'x 557 (9th Cir. 2013); Compl. ¶¶ 525-33. The possibility of statutory relief confirms only that there *is* an adequate remedy at law, foreclosing this claim.

*Second*, the State agrees that unjust enrichment is unavailable when a contract governs the relevant matter. Opp. 26. And it does not dispute that it had contracts with Defendant CVS Caremark governing the price it paid for insulin, and has nothing to say about the decision dismissing a similar unjust-enrichment claim for that

very reason. Br. 32-33 (citing *Harris Cnty. v. Eli Lilly & Co.*, 2022 WL 479943, at *14 (S.D. Tex. Feb. 16, 2022)). The State argues that it has no contract with the Manufacturers themselves, and that the Court can rely on unjust enrichment to imply one. Opp. 26-27. But even if the State did not contract directly with the Manufacturers, the "matter at issue"—how rebates affect insulin prices—is "governed by" contracts, rendering unjust enrichment "inapplicable." *Associated Mgmt. Servs., Inc. v. Ruff*, 424 P.3d 571, 595 (Mont. 2018). And in the absence of *any* relationship whatsoever between the Manufacturers and either the State or its citizens, the State cannot show that a contract is "implied by the facts and circumstances of the case." *Welu v. Twin Hearts Smiling Horses, Inc.*, 386 P.3d 937, 945 (Mont. 2016).

**Third**, the State confirms it cannot allege that the Manufacturers unjustly gained *anything* through the supposed scheme. Despite insisting that the Manufacturers "immensely profited," the State acknowledges that the Manufacturers in fact merely "maintain[ed] their net prices" while rebates to PBMs increased. Opp. 26. Nor does it claim that the Manufacturers are better off than they would have been without the rebate system. The State's inability to allege unjust *gain* is fatal.

### C. The Opposition Confirms That The State Has Not Adequately Alleged A Civil-Conspiracy Claim.

The civil-conspiracy claim also fails. The State improperly tries reframing that claim as alleging an antitrust price-fixing conspiracy, in which the Manufacturers

and PBMs coordinated to raise insulin prices in parallel. That is not what the Complaint alleged—which explains why the State ultimately concedes that antitrust law applies here, if at all, only "[a]nalogously." Opp. 42. Instead, the four-paragraph civil-conspiracy cause of action alleges a conspiracy to commit the underlying violations discussed above: "a civil conspiracy … to violate the MUTPCPA and to commit unjust enrichment." Compl. ¶ 535. It is thus derivative of those underlying claims. Indeed, the State *admits* this, confirming that it "anchors its civil conspiracy claim" on supposed "violation[s] of the [MUTPCPA] and the doctrine of unjust enrichment." Opp. 28.[5] Because those claims fail, the civil-conspiracy claim fails, too.

Even if the State could now overhaul that theory via its Opposition (which it cannot), its replacement is a nonstarter. To plead a conspiracy, allegations "of parallel conduct and a bare assertion of conspiracy will not suffice." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). "Allegations of facts that could just as easily suggest rational, legal business behavior by the defendants as they could suggest an illegal conspiracy are insufficient to plead a violation of the antitrust laws." *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1049 (9th Cir. 2008).

---

[5] The State reinforces this point with its reference to other plaintiffs' civil-conspiracy claims (Opp. 32), all of which were predicated on supposed agreements to commit underlying violations—not standalone antitrust claims. *Mississippi ex rel. Fitch v. Eli Lilly & Co.*, 2022 WL 3222890, at *8 (S.D. Miss. Aug. 9, 2022); *Harris Cnty. v. Eli Lilly & Co.*, 2020 WL 5803483, at *18 (S.D. Tex. Sept. 29, 2020); *In re Insulin Pricing Litig.*, 2019 WL 643709, at *7 (D.N.J. Feb. 15, 2019).

The State's new theory is entirely consistent with "rational, legal business behavior." *Id.* Its argument centers on claims of "lockstep price increases" and "[p]rice uniformity" for insulin. Opp. 30, 32. But lockstep increases are "just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market," and so do not support an inference of conspiracy. *Twombly*, 550 U.S. at 554. That is particularly true where—as alleged here (Opp. 30-31)—there is significant concentration among competitors. Such concentration "makes conscious parallel behavior more likely," as "firms are cognizant of—and reacting to—similar market pressures." *DRAM Indirect Purchaser Antitrust Litig. v. Samsung Elecs. Co.*, 28 F.4th 42, 52 (9th Cir. 2022) (citation omitted).

Here, the State concedes the "similar market pressure" affecting the Manufacturers: the threat of exclusion from formularies if they do not pay sufficient rebates. Compl. ¶¶ 340, 365. The Manufacturers unsurprisingly responded to this common pressure by each raising list prices so they could pay additional rebates. Like adopting "similar policies" across an industry, adopting similar prices "does not reveal anything more than similar reaction to similar pressures within an interdependent market." *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1196 (9th Cir. 2015). This is especially true given the State's recognition that the Manufacturers *compete* for formulary placement. Compl. ¶¶ 348, 363; Br. 17-18. There is no squaring that competition with the State's claim that the Manufacturers *conspire*

with one another and with the PBMs who control those formularies.

The State also points to meetings among Defendants' representatives. Opp. 31. That entirely unsurprising fact does nothing to make the State's conspiracy claim any more plausible. "Attendance at industry trade shows and events is presumed legitimate and is not a basis from which to infer a conspiracy, without more." *In re Graphics Processing Units Antitrust Litig.*, 527 F.Supp.2d 1011, 1023 (N.D. Cal. 2007). That is especially true given that PBMs *by definition* negotiate with the Manufacturers. *See* Mont. Code Ann. § 33-2-2402(7)(a) (one service provided by PBMs is "negotiating rebates, discounts, or other financial incentives and arrangements with manufacturers"). And while the State asserts that some pricing decisions occurred "shortly after industry conferences," that is unremarkable: "[g]iven the sheer number of meetings attended …, every [price move] will follow on the heels of a meeting." *Graphics Processing*, 527 F.Supp.2d at 1023. Thus, even if the State *had* pleaded an antitrust conspiracy, dismissal would be required.

## CONCLUSION

The Manufacturers respectfully request that the Court dismiss the Complaint with prejudice.

DATED this 28th day of April, 2023.

By: /s/ Elizabeth W. Lund
BERG LILLY, PC
*Attorney for Defendant Sanofi-Aventis U.S. LLC*

By: /s/ William M. Mercer
HOLLAND & HART - BILLINGS
*Attorney for Defendant Eli Lilly and Company*

By: /s/ Emma L. Mediak
GARLINGTON, LOHN & ROBINSON, PLLP
*Attorney for Defendant Novo Nordisk Inc.*

**CERTIFICATE OF COMPLIANCE**

I hereby certify that the lines in this document are double-spaced, that the type in this document is proportionately spaced and is in 14-point font, and that this document consists of a total of 4,482 words, excluding the table of contents, table of citations, certificate of service, and certificate of compliance.

*/s/ Elizabeth W. Lund*
Elizabeth W. Lund